# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION
# CIVIL DIVISION

James L. Koutoulas

      Plaintiff,

vs.

United States Securities and Exchange Commission

      Defendant.

_____/

## MOTION TO QUASH AN ADMINISTRATIVE SUBPOENA

COMES NOW, James Koutoulas ("Mr. Koutoulas"), an individual resident of Miami Beach, Florida, by and through the undersigned counsel files for his Motion to Quash an Administrative Subpoena issued by the United States Securities and Exchange Commission (the "Commission") under 17 C.F.R. § 203.8 regarding LGBcoin, a non-security meme cryptocurrency, and in support thereof respectfully states as follows:

## INTRODUCTION

1.	This Motion to Quash an Administrative Subpoena is fundamental to the ongoing public policy and legal/regulatory debate affecting the multi-trillion-dollar cryptocurrency industry and the City of Miami, which has become one of the United States' most important cryptocurrency hubs.

2.	In *United States v. Morton Salt,* 338 U.S. 632 (1950), the Supreme Court held that in evaluating the appropriateness of an administrative subpoena request, a court must simply

determine that "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."

3.      The Commission's jurisdiction is limited to "securities," and the federal securities statutes and regulations and their enforcement. *See* Securities Act of 1933, 15 U.S.C. 77a-77mm (1934), Sec. 2, Exchange Act of 1934, Sec. 4.

4.      Here, LGBcoin, a meme cryptocurrency, is *not* a security pursuant to the seminal Supreme Court case *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). *Howey* establishes a *prima facie* test for the definition of a "security," and an "investment contract." LGBcoin does not satisfy that test.

5.      Yet, in this matter, the Commission has issued an administrative subpoena (the "Subpoena") despite the fact that the inquiry is not within the authority of the Commission because there is no security at issue in this matter.

6.      LGBcoin was created as a joke based on the "Let's Go Brandon" meme. It has a decentralized finance ("DeFi") community that has used the coin to facilitate donations to non-profit organizations.

7.      As noted above, the Commission is a creature of federal statute. Congress created the Commission in 1934. Accordingly, the Commission cannot be allowed to unconstitutionally expand its jurisdiction without express congressional authority. Such unconstitutional overreach will result in the nascent cryptocurrency industry being irreparably damaged, and market participants in this emerging sector having their projects and businesses destroyed in direct violation of their Fifth Amendment right to due process and First Amendment right to free speech.

8.      In a sworn declaration, Mr. Koutoulas attests, "LGBcoins have never been sold pursuant to an investment contract of any kind such as a prospectus, purchase agreement, SAFE, SAFT,

limited partnership agreement, or any document or agreement that gave any expectation of ownership of underlying assets, nor any claims that proceeds would be used to support a business nor to facilitate technology development."[1]

9.      *Howey* holds that an investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey,* 328 U.S. at 298-99. Thus, *Howey* establishes a three-factor test: (i) an investment of money, (ii) in a common enterprise, and (iii) with profits to be derived solely from the efforts of others. *See id.; Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

10.     Therefore, the Commission does not have jurisdiction to issue the Subpoena.

## JURISDICTION

11.     Jurisdiction is proper as this motion contains claims under the First and Fifth Amendments to the United States Constitution.

12.     This motion also contains a claim challenging the Commission's jurisdiction since LGBcoin is not a security, the Commission does not have Congressional authority to regulate it or bring enforcement actions against non-securities, and the Commission has not given market participants fair notice.

13.     Based on the foregoing, this Court has ordinary federal-question authority to resolve "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U. S. C. §1331. The Commission's statutory review scheme does not displace a district court's federal question jurisdiction over claims challenging the constitutionality of its in-house administrative

---

[1]  A true and correct copy of the James Koutoulas Declaration [hereinafter "Koutoulas Decl."] is filed concurrently herewith.

proceedings. *See Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 906 (2023) (consolidated with *Cochran v. SEC*).[2]

14.     Therefore, this Court has jurisdiction over this matter.

## VENUE

15.     Mr. Koutoulas resides and is domiciled in Miami Beach, Florida and the documents being sought under the subpoena are located in Miami Beach, Florida; therefore, venue in this Court is appropriate.

## THE PARTIES

16.     Mr. James Koutoulas is a securities lawyer who has run a regulated asset management business for fifteen (15) years. That business is headquartered in Miami Beach, Florida, and manages entities that are in good standing with the National Futures Association, CFTC, the Commission, the United Kingdom Financial Conduct Authority and the Cayman Islands Monetary Authority. Mr. Koutoulas has never had an enforcement action taken against an entity he manages. Mr. Koutoulas was initially the trustee of the Foundation while it was pending organization, then later an authorized signer of the Foundation's sole director, LGBcoin, Ltd.

17.     The Commission is based in Washington, D.C. and was empowered by Congress to regulate and enforce the federal securities laws and regulations.

---

[2] *See also* Eric Nelson & Scott Mascianica, *Supreme Court's 9-0 Ruling Paves Way for Constitutional Challenges to Administrative Proceedings,* Holland & Knight, *available at* https://www.hklaw.com/en/insights/publications/2023/04/supreme-courts-90-ruling-paves-way-for-constitutional-challenges (Last visited June 22, 2023).

## PROCEDURAL HISTORY

18. LGBcoin is not a security. Despite that, the Commission issued the administrative subpoena (the "Subpoena") dated January 26, 2023 (Exhibit B).

19. Mr. Koutoulas made an Administrative Objection when, through counsel, he notified the Commission that the Subpoena was improperly issued due to lack of jurisdiction since LGBcoin is not a security, *See* Exhibit A.

20. The Commission agreed to a limited, voluntarily production of documents by Mr. Koutoulas focusing exclusively on the issue of whether LGBcoin is a security or not.

21. Mr. Koutoulas reserved all his rights under Rule 8 of the Commission's Rules Relating to Investigations. *See* Exhibit A1; 17 C.F.R. § 203.8.

22. On June 9, 2023, and in response to limited production by Mr. Koutoulas, the Commission required that Mr. Koutoulas produce all documents according to the Subpoena. Thus, Mr. Koutoulas' Administrative Objection was denied.

23. The Commission did not provide any supporting law or argument as to what grounds it has to consider LGBcoin a security.

24. Since LGBcoin is not a security, the Commission does not have jurisdiction to issue and enforce the Subpoena.

25. Accordingly, Mr. Koutoulas properly brings this motion to this Court to quash.

## BACKGROUND

26. Bitcoin, the first cryptocurrency was created in 2008, 15 years ago.

**Major Questions Doctrine**

27.     Unlike many other jurisdictions such as the EU, Singapore, Switzerland, and even the State of Wyoming, Congress has yet to pass any cryptocurrency-specific statutes regarding, nor has Congress passed a statute directing the Commission to regulate cryptocurrency.

28.     Given the "vast economic and political significance" of the cryptocurrency industry, the absence of congressional authorization for the Commission to promulgate regulations makes the Supreme Court's "Major Questions Doctrine" applicable.[3]

**The Commission Has Not Given the Cryptocurrency Industry Fair Notice**

29.     Similarly, the Supreme Court recently ruled 9-0 to restrict the Commission's authority to unilaterally conduct administrative proceedings without the oversight of the district courts.[4]

30.     Moreover, the Commission has a history of making public statements that make its recent policy of conducting 'regulation by enforcement' untenable under the Fair Notice Doctrine.

31.     In a recent cryptocurrency-related holding, Judge Torres of the Southern District of New York denied the Commission's motion to strike after Ripple argued the Commission has unfairly engaged in regulation by enforcement. That Court emphasized, "[a]t the very least, these facts, if true, would raise legal questions as to whether Ripple had fair notice that the term 'investment contract' covered its distribution of XRP, and the Court may need to consider these questions more deeply."[5]

32.     Judge Torres continued, "While it is unclear whether Ripple will prevail on the merits of this affirmative defense or in the overall case, the denial of the SEC's motion permits Ripple to assert the affirmative defense of "fair notice." *See id.*

---

[3] Congressional Research Service, *The Supreme Court's "Major Questions" Doctrine: Background and Recent Developments, available at*  **https://crsreports.congress.gov/product/pdf/LSB/LSB10745** (last visited June 22, 2023) (citing *Alabama Assn of Realtors v. HHS,* 141 S. Ct. 2485 (2021), *Nat'l Federation of Independent Bus. v. OSHA,* 595 U.S. ___ (2022), *West Virginia v. EPA,* 597 U.S. ___ (2022)
[4] *See Nelson, supra* at n. 6.
[5] *See Order, SEC v. Ripple Labs,* SDNY 20 Civ. 10832 (AT) (SN) at ECF 440

33.     This is in stark contrast to the detailed fair notice given to the stock lending industry given by the Commission as explained by Mark Cuban.[6]

34.     The lack of fair notice is especially key in this matter, given that if Congress, and/or the Commission, had promulgated laws or regulations that impacted LGBcoin, Mr. Koutoulas would have ensured that LGBcoin complied with them.

35.     In fact, only recently, on June 2, 2023, has Congress published a discussion draft[7] of a bill put forth by the House Financial Services and House Agricultural Committees which have jurisdiction over the Commission and the Commodities Futures Trading Commission, respectively.

36.     The discussion draft bill proposes to split authority between the Commission and the CFTC, including delegating to the CFTC certain coins that the Commission has unilaterally stated it believes are securities.

37.     But, despite being 162 pages, it only proposes to order a study of DeFi, the category in which meme coins such as LGBcoin fall under.

38.     The Commission has never taken enforcement action against other major meme coins, such as DOGE and SHIB, to circulate without any restriction or any attempt to legally, or even verbally, classify them as securities by the Commission since they were minted in 2013 and 2020, respectively.

39.     The Commission, however, has created a great deal of uncertainty around cryptocurrency in general. Indeed, various high-ranking Commission officials have made periodic proclamations

---

[6] *See "Tweet by Mark Cuban,"*
**https://twitter.com/mcuban/status/1667153158106226692?s=42&t=IyUV0WqwatoVmWTagXKFHg**
[7] *See "Discussion Draft" Bill-* **https://financialservices.house.gov/uploadedfiles/glb_03_xml.pdf**

of their views as to what may-or-may-not be a security, without any formal rulemaking activities to give clarity to market participants.

40.    Moreover, the Commission has not even issued any updated interpretative notices on the the matter since 2019, which focused primarily on initial coin offerings ("ICOs").

41.    For example, William Hinman, a former senior Commission official ("Mr. Hinman"), declared in a speech that a "token . . . all by itself is not a security, just as the orange groves in Howey were not."[8]

42.    Mr. Hinman further stated that ether—the native token of the Ethereum blockchain—also is not a security, and that a digital-asset security loses that status once "the network on which the token or coin is to function is sufficiently decentralized."[9]

43.    This policy was mirrored when the Commission issued a report deciding not to pursue an enforcement action against a Decentralized Autonomous Organization because it was sufficiently decentralized.[10]

44.    Separately, in 2019, a Commission division published a "Framework" that included Hinman's concept of decentralization as one of more than 60 factors that the industry should assess to determine whether a digital asset is (in the Commission's view) an "investment contract" under *Howey*.[11]

45.    The Framework further stated that it "d[id] not replace or supersede" the 2018 Hinman Speech, and encouraged continued reliance on it.[12]

---

[8] William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, (June 14, 2018), *available at*  **https://www.sec.gov/news/speech/speech-hinman-061418**
[9] *Id.*
[10]  SEC, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017), available at **https://www.sec.gov/litigation/investreport/34-81207.pdf**
[11]  SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), *available at* https://bit.ly/2HXfEdZ
[12] *Id.* at n.1.

46.     The Commission's Chairman, Mr. Gensler, has also made many conflicting statements about the industry that prove that participants do not have fair notice.

47.     In May 2021 Congressional testimony, Mr. Gensler "noted that the crypto-asset sector is now almost $2 trillion in market capitalization. 'I think it's only Congress that could really address it. It would be good to consider – you asked my thoughts – to consider whether to bring greater investor protection to the crypto exchanges,'" said Gensler."[13]

48.     "[T]he exchanges trading in these cryptoassets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission [ . . . ] Right now, there is not a market regulator around these crypto exchanges."[14]

49.     Many of Mr. Gensler's comments illustrating the lack of fair notice in cryptocurrency regulation have been collated by the Committee on Capital Markets Regulations which provides the following in "Cryptoasset Trading Platforms Cannot Register as Securities Exchanges:[15]

> "In this statement, the Committee on Capital Markets Regulation (the "Committee") explains why the SEC's own policies in fact make it impossible for cryptoasset trading platforms to do what the SEC now insists that they do – that is, registering and operating in compliance with the regulatory framework for securities exchanges. These reasons fall into two categories. First, registered securities exchanges can only trade securities, but SEC rules and guidance largely prevent cryptoassets from being registered as securities. As a result, there are virtually no cryptoassets that a cryptoasset trading platform registered as a securities exchange could list and trade. Second, even if there were cryptoassets registered as securities, existing SEC rules and guidance make it impossible for cryptoasset trading platforms to register and comply with the requirements applicable to securities exchanges." *Id.*

(Internal citations and quotations in original).

50.     The Committee continues:

---

[13]     Ledger Insights, *"SEC's Gensler suggests regulating cryptocurrency exchanges,"* **https://www.ledgerinsights.com/sec-gensler-suggests-regulating-cryptocurrency-exchanges/**

[14] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III, Virtual Hearing Before the Committee on Financial Services, U.S. House of Representatives 12 (May 6, 2021),* **https://www.govinfo.gov/content/pkg/CHRG-117hrg44837/pdf/CHRG-117hrg44837.pdf**.

[15] Committee on Capital Markets Regulation, *"Cryptoasset Trading Platforms Cannot Register as Securities Exchanges,"* **https://capmktsreg.org/wp-content/uploads/2023/06/CCMR-Crypto-Exchanges-Cannot-Register-With-the-SEC-06-06-23.pdf**

"Although Chair Gensler contends that the "vast majority"[16] of cryptoassets are securities, as of 2023, only nine cryptoassets out of the over 23,000[17] estimated to currently exist have been registered as securities with the SEC. Of these nine, three are out of existence, and one is no longer registered as a security[18]. Those five that remain registered account for virtually 0% of the approximately $230 billion in current daily global cryptoasset trading volume and 0% of the total $1.2 trillion global cryptoasset market capitalization. As a result, if a cryptoasset trading platform could actually register as a securities exchange today, then it would immediately be forced out of operation, because it would have nothing to list or trade." *Id.*

(Internal citations and quotations in original).

51.    The Committee also details how "the SEC has provided no framework for applying securities law requirements to cryptoassets" on page 2 and that "Classifying a cryptoasset as a security would likely mean that market participants would not want to own it" on page 3. *Id.*

52.    Of crucial importance to this matter, the Committee notes that "SEC Commissioner Peirce highlighted these concerns in a recent speech, noting that if the SEC classifies a cryptoasset as a security, "secondary purchasers of the token often are left holding a bag of tokens that they cannot trade or use because the SEC requires special handling consistent with the securities laws."[19] *Id.*

53.    Recognizing that current regulations provide inadequate due process, Commissioner Hester Peirce has called for a safe harbor to be created, to give cryptocurrency creators a three-year grace period to be exempt from any federal securities regulations.[20]

---

[16] SEC, *SECURITIES & EXCHANGE COMMISSION* ["*SEC*"], *Chair Gary Gensler, Kennedy and Crypto (Sept. 8, 2022)*, **https://www.sec.gov/news/speech/gensler-sec-speaks-090822**.

[17] COINMARKETCAP, *All Cryptocurrencies,* https://coinmarketcap.com/all/views/all/ *(as of May 5, 2023)*

[18] Brady Dale, *The Few Crypto Firms That Have Registered with the SEC AXIOS (Mar. 6, 2023)*, **https://www.axios.com/2023/03/06/crypto-register-sec-securities-exchange-commission**.

[19] SEC, *Commissioner Hester M. Peirce, Outdated: Remarks Before the Digital Assets at Duke Conference (Jan. 20, 2023)*, https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023; *see also* COINBASE INC., *Petition for Writ of Mandamus to the United States Securities and Exchange Commission 11-12 (3d. Cir., April 24, 2023)*, https://assets.ctfassets.net/c5bd0wqjc7v0/5PWsXaPsqQ61gA9wlFWKEX/d1d3a27d35687082565770589ef9a3ac/Coinbase_-_Mandamus_Petition__TO_FILE_.pdf  pgs. 11-12 (*"If a digital asset itself is registered as a security, it will often be impossible for anyone to use it, defeating the point of registration."*).

[20] SEC, *Token Safe Harbor Proposal 2.0,* **https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0**

54.   This sentiment has been echoed by former Commission Chairman Arthur Levitt, who writing with Registered Investment Advisor Ram Ahluwalia, call for new regulations saying, "Market participants who want to work within the securities laws or engage the SEC don't have a clear path to compliance. Coinbase, a major cryptocurrency market and dealer, went public with the SEC's approval—and then couldn't get approval from the Financial Industry Regulatory Authority to offer crypto assets through its own broker dealer since many crypto assets are considered unregistered securities."[21] Levitt and Ahluwalia continue,

55.   "The SEC has said it can use existing rules to do its work, but that isn't really true. Web3 decentralization raises thorny questions for the *Howey* test—the legal determination of whether a transaction contract is an investment contract and, therefore, a security."

56.   Still, in the absence of any statutory authority from Congress and a total lack of cryptocurrency-specific regulations, the Commission has resorted to regulating by enforcement, recently filing an enforcement action against Coinbase. Coinbase has expressly begged the Commission to provide a pathway to registration for years and even filed a rule-making petition well ahead of the Commission filing its enforcement action.[22]

57.   Prior to becoming a target of the Commission's regulation by enforcement strategy, Coinbase filed an *amicus brief* in *SEC v. Ripple Labs*, stating in part, "Enforcement actions should not be the primary means by which the SEC makes known what it considers to be illegal. This is particularly true when it comes to regulating emerging U.S. industries, like the cryptocurrency

---

[21]   WSJ-*A New Framework for Crypto Regulation*, **https://www.wsj.com/articles/framework-crypto-cryptocurrency-sec-investors-decentralized-regulators-banks-stablecoins-rules-blockchain-financial-crisis-11666294238** (last visited June 22, 2023)
[22]   *See SEC v. Coinbase, Inc. and Coinbase Global, Inc., SDNY* 23 Civ. 4738 and *Coinbase Slams 'Evasive Response' from SEC to Court Order*, **https://news.yahoo.com/coinbase-slams-evasive-response-sec-001557351.html**

sector, which can be driven overseas by unexpected enforcement litigation, leaving customers without protection."[23]

58.    This questionable-at-best enforcement action was filed contemporaneously with Mr. Gensler making the statement, "'We already have digital currency. It's called the U.S. dollar. It's called euro. It's called the yen."[24]

59.    This statement is suspect and shows bias, especially in light of Mr. Gensler's enthusiastic endorsement of Algorand in 2019, which the Commission has now alleged is an unregistered security in *SEC v. Coinbase* and his statement that at least 75% of cryptocurrency coins are commodities, not securities.[25]

**The evolution of cryptocurrency in a vacuum of statute and regulation that mirrors that of crowdfunding**

60.    The first known modern crowdfunding transaction was in 1997 when a British rock band crowdfunded a tour through online donations.[26]

61.    Crowdfunding platforms such as ArtistShare, IndieGoGo, and Kickstarter subsequently launched in 2001, 2007, and 2009, respectively.

62.    Those platforms enabled enthusiasts to support projects by means of donations, or receiving only incidental combination like t-shirts, or a product contingent on launch.

---

[23] *See SEC v. Ripple Labs Inc, et al,* 20 Civ. 10832 (AT) (SN)- *AMICUS CURIAE BRIEF OF COINBASE, INC. IN SUPPORT OF THE DEFENDANTS' FAIR NOTICE DEFENSE,* **https://www.crypto-law.us/wp-content/uploads/2022/11/11142022-Coinbase-Amicus-Brief-in-Support-of-Ripple-FND.pdf**

[24] The Street- *Gary Gensler: 'We Don't Need More Digital Currency',* **https://www.thestreet.com/cryptocurrency/gary-gensler-we-dont-need-more-digital-currency** (last visited June 22, 2023)

[25] CoinTelegraph, *"SEC's Gensler called ALGO 'great technology' in 2019: SEC now deems it a security,"* **https://cointelegraph.com/news/video-of-sec-chair-praising-algorand-resurfaces-after-recently-deeming-it-a-security,** YouTube, *Gary Gensler SEC, 75% of crypto are commodities not securities his own words,* ***https://www.youtube.com/watch?v=Tn74sXTMSPA*** (last visited June 22, 2023)

[26] Startups.com, *A Brief History of Crowdfunding,* **https://www.startups.com/library/expert-advice/history-of-crowdfunding** (last visited June 22, 2023)

63.     Only in 2012, 15 years after the first modern crowdfunding transaction was completed, did the US pass the JOBS Act to provide for legalized security-based crowdfunding.

64.     Then, 3 years later in 2015, the SEC adopted rules to permit crowdfunding[27]- that is 18 years *after* the first modern crowdfunding transaction.

65.     By 2020, crowdfunding raised $73.9 billion in equity in the U.S. and Canada.[28]

66.     The size of the cryptocurrency market has already exceeded crowdfunding by over thirteen (13) times.

67.     Similar to crowdfunding, meme coins have provided a non-security mechanism for enthusiasts to support cryptocurrency projects or raise funds for advocacy.

68.     For example, DOGE and SHIB, which are simply jokes about dogs, have aggregate worths of $9 billion and $5 billion, respectively, as of June 22, 2023. PEPE, a recently launched political meme coin, is collectively worth $622 million. Even the City of Miami launched a meme coin, Miami Coin, where it used a portion of revenues to support technology development. None of these have had any public enforcement actions taken by the Commission or indications that the Commission views them as securities.

**Meme Coins are not Securities**

69.     The first meme coin, Dogecoin, was created in 2013, as a joke that subsequently went viral, much like LGBcoin.

70.     LGBcoin itself specifically exists on the ERC-20 subset of the decentralized Ethereum blockchain designated for digital collectibles.

---

[27] SEC, *SEC Adopts Rules to Permit Crowdfunding, **https://www.sec.gov/news/press-release/2015-249*** (last visited June 22, 2023)

[28]     Statista.com*, Volume of funds raised through crowdfunding worldwide in 2020, by region,* **https://www.statista.com/statistics/946659/global-crowdfunding-volume-worldwide-by-region/** (last visited June 22, 2023)

71.     The meme coin genre of cryptocurrencies is the digital equivalent of non-security collectibles, like baseball cards, Beanie Babies, and Air Jordan sneakers which are obviously not regulated by the Commission.

72.     Similarly, LGBcoins do not convey any claims of ownership in a company, interest payments from a note, cash flows of any kind, voting rights, or any other elements of securities.

73.     While certain individuals may choose to speculate on them on their own volition, that does not transform them into securities and the Commission lacks jurisdiction over them—just like baseball cards and Beanie Babies. And, like baseball cards and Beanie Babies—which buyers may choose to speculate over—the Commission cannot claim such jurisdiction without "clear congressional authorization,"[29] which is lacking here.

74.     In layman's terms, if the Commission has its way in this case, it can give LGBcoins a death sentence merely by classifying it as an unregistered security. There is no regulatory framework whatsoever under which it could register, and it does not meet the definition of an investment contract under *Howey*. There is also no active cryptocurrency exchange that could readily trade a security meme coin under current regulations. Accordingly, they could not be readily bought or sold in the United States under the current regulatory environment.

## LEGAL ARGUMENT

75.     Here, the key purposes of LGBcoin are for DeFi community members to use a portion of revenue to support charitable giving, political donations, and First Amendment-protected advocacy for free speech, anti-de-platforming, and pro-America issues. To date, LGBcoins have been used by its holders, in each's own discretion, to make approximately $500,000 in donations

---

[29] *See West Virginia v. EPA,* 142 S. Ct. 2587, 2607-10 (2022).

to non-profit organizations including Turning Point USA, Project Veritas, Aquanauts Adaptive

Aquatics, ACRE DAO, and the Goodman Institute.

76.     Over $100,000 in USD proceeds from the sale of LGBcoins was also donated to political

candidates and Political Action Committees by DeFi community members, in each's own

discretion.

77.     "The token itself is *never the* security," is a key, often misunderstood concept in the

emerging area of cryptocurrency law as explained by Amicus Curiae, XRP Holders, *See also*

"The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities."[30]

78.     As explained by XRP Holders:

> "[T]here is no precedent that analyzes whether an underlying asset of an investment
> contract is itself a security." ECF 649 at 3. The reason there is no precedent, is because
> the underlying asset, *in an investment contract,* is *never* the security. *Howey*, 328 U.S. at
> 301 ("If that test be satisfied, it is immaterial... whether there is a sale of property with or
> without intrinsic value."); *Telegram*, 448 F. Supp. 3d at 379 ("the security...is not simply
> the Gram, which is little more than alphanumeric cryptographic sequence."). The same
> *must* be said about XRP. ECF 640 at 10 ("Stripped down, XRP is just computer code.").
> Claiming the token itself is the security is akin to calling the oranges, in *Howey,* the
> securities. In *Telegram*, the Court made it clear that the central issue in *Howey* and
> *Telegram* was not the underlying product, agreement, or the underlying asset. *Id*. The
> Court confirmed that the underlying asset (whether oranges or digital tokens) are not
> themselves investment contracts. *Id*. Any doubt or confusion regarding whether the Court
> considered the token itself a security was laid to rest when Judge Castel issued a second
> ruling in *Telegram*. 2020 WL 1547383 at *1 (clarifying that the central point of the
> Court's holding was that "the 'security' was **neither the Gram Purchase Agreement
> nor the Gram."**) (emphasis added). In *Telegram*, there existed *actual written contracts*
> between the promoter and the investors, yet the underlying written contract, itself, was
> not the security. *Id.* Considering *Telegram* involved a pure ICO, with a blockchain yet to
> be built, if there ever existed a case where the token itself constituted the security, it would
> be *Telegram*. However, the Court made it crystal clear that the underlying asset, in an
> investment contract, is not the security. *Id.* In addition to disregarding precedent spanning
> from 1946 (*Howey*) to 2020 (*Telegram*), the SEC's farfetched XRP theory also contradicts

---

[30] *See* Brief of Amicus Curiae in Opp. to Pl's Mot. for Summary Judgment [hereinafter "XRP Brief"], *SEC v. Ripple Labs Inc, et al,* 20 Civ. 10832 (AT) (SN) (S.D.N.Y. Nov. 15, 2022) (ECF No. 708), *available at* **https://www.crypto-law.us/wp-content/uploads/2022/11/11152022-Amicus-Brief-XRP-Holders-Copy.pdf;** Lewis Cohen, et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets are not Securities*, DLx Law, Nov. 10, 2022, *available                                                                                                                                    at* **https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID4282385_code3145971.pdf?abstractid=4282385&mirid=1** (last visited June 22, 2023).

the SEC's own guidance. The most litigated piece of evidence in this case, the Hinman Speech, is instructive. Director Hinman unequivocally stated: "the token – or coin or whatever the digital information packet is called – **all by itself** is not a security, just as the orange groves in *Howey* were not." *Hinman Speech* (emphasis added). Director Hinman also noted "the digital asset itself is simply code." *Id*. Director Hinman emphasized "that the analysis of whether something is a security is not static and does not strictly inhere to the instrument." *Id.* Just like any other commodity, "investment contracts can be made out of virtually any asset (including virtual assets)." *Id*. Former Chairman Clayton agreed. *See Mar. 7, 2019 Ltr. from Chairman J. Clayton to Congressman Ted Budd,* ECF 124-5 ("I agree that the analysis of whether a digital asset is offered or sold as a security is not static and **does not strictly inhere to the instrument**.") (emphasis added). Even more significant, the SEC's 2019 *Framework* stated that a virtual currency being utilized in payments – the very thing XRP was designed to do - is unlikely to satisfy *Howey* ECF 429-4." *Id.*

XRP Brief at 12-13 (citations and quotations in original) (emphasis in original).

79.   XRP continues:

"The Hinman Speech and the *Framework* made perfect sense considering 76 years of caselaw has shown that practically any asset or commodity can be offered as a security, whether that asset be orange groves, whiskey, chinchillas, condos, beavers, or Bitcoin. *See Howey*, 328 U.S. 293 (1946); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974); *Miller v. Cent. Chinchilla Grp., Inc*., 494 F.2d 414 (8th Cir. 1974); SEC Rel. No. 33-5347 (Jan. 4, 1973); *Kemmerer et al. v. Weaver et al*., 445 F.2d 76 (7th Cir. 1971); and *SEC v. Shavers*, 4:13-cv-00416, 2013 WL 4028182, Aug. 6, 2013, respectively. When an asset is offered and sold as an investment contract, therefore a security, it does not transform the underlying asset itself into a security. Oranges remain oranges and XRP remains XRP – digital code. Therefore, even if Ripple offered XRP as a security - *related to specific transactions* – XRP would still remain exactly what multiple government agencies classified it as, in 2014, 2015, and 2019 - a decentralized virtual currency." *Id.*

80.   Like XRP, orange groves, chinchillas, condos, beavers, or Bitcoin, LGBcoin is simply computer code and an asset. *See id.*

81.   However, unlike XRP, LGBcoins have *never* been offered pursuant to an investment contract between investors and either Mr. Koutoulas or the Foundation[31], and they have *never* been the underlying asset for a security.

---

[31] LGBcoin Foundation, now known as the LetsGoBrandon.com Foundation, (the "Foundation") is a Cayman Islands-domiciled non-profit foundation charged with performing operational functions to support LGBcoin. The Foundation was renamed after a group of LGBcoin holders created a hard fork of the coin, called $LETSGO, then a dispute between those holders and the Foundation was settled to reunify the project behind the successor coin, $LETSGO.

82.     LGBcoins are functionless digital collectibles on the ERC-20 subset of the Ethereum blockchain.

83.     LGBcoins were created by an anonymous developer using an unmodified open-source contract with no functionality on behalf of a decentralized finance ("DeFi") community.

84.     LGBcoins can be bought and sold via decentralized liquidity pools using protocols such as UniSwap or SushiSwap which may be set up by any DeFi community members that owns LGBcoins and other Ethereum-based DeFi coins to pair within the liquidity pool.

85.     LGBcoins can also be bought and sold via peer-to-peer transactions.

86.     Hundreds, if not thousands, of owners of LGBcoins have made their own individual efforts to raise awareness of LGBcoin by creating and sharing memes, talking about LGBcoin and the Movement in chat rooms, and/or providing technical assistance to the community, acknowledging that any expectation of profit they may have had was not based solely on the efforts of others per *Howey*.

87.     There was never an "initial coin offering" or "ICO" of LGBcoins.

88.     Indeed, LGBcoins have been clearly and concisely described as having no intrinsic value and that buyers should have no expectation of the ability to resell them. *See letsgobrandon.com* (last visited June 22, 2023). LGBcoin's website explicitly states, "Lets Go Brandon coin is America's Coin: an ERC-20 digital collectible meme coin on the Ethereum Blockchain that allows owners to digitally voice their support for America and the American dream. Lets Go Brandon has no intrinsic value and you should not purchase it with any expectation that you will be able to resell it. **Please do not spend money that you cannot afford**." *See id.* (emphasis added).

89.     Thus, buyers could not reasonably expect profits from buying LGBcoins.

90.    Rather, LGBcoins are akin to the digital equivalent of trading cards, Beanie Babies, collectible sneakers, luxury handbags, or watches without precious metals or gems in that that have no intrinsic value, but instead are valued solely by market demand, are frequently bought and sold on digital platforms, and may benefit from subsequent, unpromised branding efforts conducted by their producer or third-parties long after sales are conducted. They are not securities.

91.    Accordingly, and as further detailed below, LGBcoin clearly fails the *Howey* test meaning it is *not* a security.

92.    Moreover, Mr. Koutoulas, in his capacity as trustee for the Foundation engaged outside counsel who provided an independent opinion letter that LGBcoin is not a security. That letter, along with exhibits, were previously provided to the Commission as part of Mr. Koutoulas's limited, voluntary production explaining why LGBcoin is not a security *See* Exhibit A.A.

93.    Despite the lack of statutory authority, rule-making activity, and fair notice, the Commission has massively expanded its crypto enforcement staffing.[32]

94.    This practice of regulation by enforcement violates constitutionally guaranteed due process rights and is the unconstitutional implementation of *ex post facto* law.

95.    If the Commission is allowed to proceed and assert jurisdiction over a non-security meme coin, the precedent would be set to allow it to classify any  good in the US economy as a security in need of regulation so much so that every store in America must register with the Commission to sell any good, any charity must register to accept donations, and even any video game with virtual currency must also register.

---

[32] U.S. Securities and Exchange Commission, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit*, May 3, 2022, **https://www.sec.gov/news/press-release/2022-78** .The SEC recently expanded its Crypto Assets and Cyber Unit under the leadership of the SEC's current Chairman Gary Gensler

96.    This absurd result would lead to eBay, Walmart, Amazon.com, World of Warcraft, the Red Cross, and virtually every small business having to register and comply with securities laws for every, single transaction in the US economy in an unbridled (and unauthorized) expansion of the Commission's jurisdiction and add massive cost and inefficiencies to the US economy.

97.    Accordingly, because LGBcoin is *not* a security, the Commission does not have jurisdiction to issue its administrative subpoena, and it must be quashed.

## ISSUES FOR CONSIDERATION BY THE COURT

98.    Could the Commission be considered objective in its evaluation of its own jurisdiction to issue the Subpoena given:

•      The fact that LGBcoin clearly is not a security under the *Howey* test;

•      The Commission does not have authority to bring a subpoena when it lacks jurisdiction over the subject matter per *US v. Morton Salt*;

•      The absence of any statutory authority directing the Commission to regulate cryptocurrency;

•      The requirement for such statutory authority under the Major Questions Doctrine.

•      The absence of rulemaking around cryptocurrencies which have many elements that differentiate them from traditional securities;

•      The failure to give fair notice to cryptocurrency market participants including statements by commissioners that Ethereum itself and tokens on the Ethereum blockchain are not securities;

•      That the Commission has admitted it does not have congressional authority to regulate cryptocurrency exchanges; and

•      The LGBcoin DeFi community is politically opposed to the administration;

## CONCLUSION

The Commission means to enforce an unconstitutional Subpoena to investigate a non-security meme cryptocurrency LGBcoin in violation of the Major Questions Doctrine, Fair Notice Doctrine, the First Amendment, the Fifth Amendment, and its own jurisdiction. Mr. Koutoulas respectfully requests that this Court quash that Subpoena lest the Commission be emboldened to further trample the rights of Americans and further harm the multi-trillion dollar cryptocurrency industry, the City of Miami, and all holders of LGBcoin and its successor,  myself included.

**Dated**: June 23, 2023.

Respectfully submitted,

*/s/ Nicole Martell*
**NICOLE MARTELL, ESQ.**
Florida Bar No.: 100172
nicole@ddpalaw.com
**DI PIETRO PARTNERS, PLLC**
901 East Las Olas Blvd, Suite 202
Fort Lauderdale, FL 33301
Primary Email Address:
service@ddpalaw.com
Secondary Email Address:
paralegal@ddpalaw.com
Telephone: (954) 712-3070
Facsimile: (954) 337-3824

## CERTIFICATE OF CONFERRAL

I HEREBY CERTIFY that on June 9, 2023, Mr. Koutoulas filed a limited voluntary production that provided evidence and argument that LGBcoin is not a security.  In a subsequent phone call, a representative of the SEC advised Mr. Koutoulas that they were seeking production. The undersigned will continue to confer with the SEC in an attempt to narrow the issues raised in

this motion and will advise the Court accordingly.

*/s/ Nicole Martell*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 23, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses on the Electronic Mail Notice List.

*/s/ Nicole Martell*