# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ERIC DE FORD and SANDRA BADER,**

        **Plaintiffs,**

**v.**                      **Case No: 6:22-cv-652-PGB-DCI**

**JAMES KOUTOULAS, JEFFREY CARTER, ERIK NORDEN, BRANDON BROWN, BRANDONBILT MOTORSPORTS, LLC, NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, ARIS GEORGE MICHALOPOULOS, THOMAS MCLAUGHLIN, CORAL CAPITAL LLC, CORAL CAPITAL MANAGEMENT LLC and CORAL DEFI LP,**

        **Defendants.**

_____/

## <u>ORDER</u>

This cause comes before the Court on the following:

1.    Defendant National Association for Stock Car Auto Racing, LLC's ("**Defendant NASCAR**") Motion to Dismiss for Failure to State a Claim (Doc. 90 (the "**NASCAR Motion**")) and Plaintiffs Eric De Ford and Sandra Bader's ("**Plaintiffs**") response in opposition (Doc. 102);

2. Defendant James Koutoulas's ("**Defendant Koutoulas**") Motion to Dismiss (Doc. 101 (the "**Koutoulas Motion**")) and Plaintiffs' response in opposition (Doc. 114);

3. Defendant Erik Norden's ("**Defendant Norden**") Motion to Dismiss (Doc. 104 (the "**Norden Motion**")) and Plaintiffs' response in opposition (Doc. 115); and

4. Defendants Thomas McLaughlin ("**Defendant McLaughlin**"), Coral Capital LLC ("**Defendant Coral Capital**"), Coral Capital Management LLC ("**Defendant Coral Management**"), and Defendant Coral Defi LP's ("**Defendant Coral Defi**") (collectively the "**Coral Defendants**") Motion to Dismiss for Lack of Personal Jurisdiction or, in the alternative, for Failure to State a Claim (Doc. 112 (the "**Coral Motion**")) and Plaintiffs' response in opposition (Doc. 123).

Upon due consideration, the NASCAR Motion is granted in part, the Koutoulas Motion granted in part, the Norden Motion granted, and the Coral Motion granted.[1]

---

[1] Also before the Court was Defendants Brandonbilt Motorsports, LLC ("**Defendant BMS**") and Brandon Brown's ("**Defendant Brandon**") (collectively, the "**Brandonbilt Defendants**") Motion to Dismiss (Doc. 88) and Defendant George Aris Michalopoulos's ("**Defendant Michalopoulos**") Motion to Dismiss (Doc. 93). After notices of settlement, (Docs. 211, 213), however, these two motions to dismiss are due to be denied as moot.

## I.    BACKGROUND[2]

This putative class action stems from the creation, marketing, and sale of the LBGCoin, a cryptocurrency. (Doc. 74). The LGBCoin saga began on October 2, 2021 when a reporter incorrectly described attendees at a NASCAR race as chanting "Let's go Brandon!" in support of NASCAR driver Defendant Brandon; in fact, they were chanting a profane pejorative to express displeasure with President Joe Biden. (*Id.* ¶¶ 1–2, 50). The reporter's mistake birthed a common understanding that the phrase "Let's Go Brandon!" (and its shorthand "LGB!") stood for a euphemistic way to express displeasure with the Biden administration: the phrase appeared on, for example, t-shirts, trucker hats, coffee mugs, wrist bands, bumper stickers, and, as is relevant here, a cryptocurrency. (*Id.* ¶¶ 2–3, 50).

Specifically, an automobile enthusiast and cryptocurrency investor came up with the idea to create the LGBCoin cryptocurrency to play off the enthusiasm for the phrase, and he enlisted the help of other individuals and entities to promote the digital coin. (*Id.* ¶¶ 3–4, 16–38).

### A.    Cryptocurrency Background

Cryptocurrency, or crypto for short, is a medium of exchange that uses digital cryptography to secure underlying transactions. (*Id.* ¶ 43). Cryptocurrencies use a decentralized system commonly called the blockchain to

---

[2]    This account of the facts comes from the Plaintiffs' Second Amended Complaint. (Doc. 74). The Court accepts the well-pled factual allegations therein as true when considering motions to dismiss. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007).

record these transactions and issue new digital currency units—i.e., crypto tokens. (*Id.* ¶¶ 43, 46). The first cryptocurrency, Bitcoin, was founded in 2009, but as of March 2022, there are at least tens of thousands in existence. (*Id.* ¶ 43).

Anyone can create a new cryptocurrency. (*Id.* ¶ 44). An internet search will provide you step-by-step instructions with videos for creating a new one. (*Id.*). Different blockchain platforms have different underlying source code, and once published, anyone can use this blockchain source code to create or mint a new cryptocurrency. (*Id.* ¶ 48). Once created, the new cryptocurrency can be traded directly on the blockchain or on certain centralized cryptocurrency exchanges. (*Id.*).

Cryptocurrency traded directly on the blockchain is stored in crypto wallets, which are online software used to store the private crypto keys to the owner's crypto assets. (*Id.* ¶ 45). Crypto wallets have unique identifiers called Wallet IDs. (*Id.*). There is no limit on the number of crypto wallets a person can control. (*Id.*).

For example, the Ethereum blockchain source code allows for the creation of cryptocurrencies that can be traded, spent, or otherwise transacted with; LGBCoin was primarily traded against Ether, the native cryptocurrency of the Ethereum blockchain network used on various decentralized crypto exchanges (where transactions are completed wallet to wallet on the blockchain, not off-chain). (*Id.* ¶ 48).

Transactions of cryptocurrencies from wallet to wallet are recorded on the blockchain's distributed public ledger maintained as a database across multiple

different computers and are publicly viewable: the amount of cryptocurrency transacted, the sender's wallet address, the recipient's wallet address, the date, and time of the transfer between wallets can be viewed by various blockchain websites. (*Id.* ¶ 46). Only the Wallet ID, as opposed to the actual identity of the owner of a particular wallet, is publicly available when users transact wallet to wallet. (*Id.* ¶ 47). The owner or user of a particular wallet may come into public view, however, when he or she transacts off the blockchain with a non-Wallet for various non-blockchain assets (goods, services, non-crypto currency, etc.). (*Id.*). This off-chain transaction sometimes reveals the identity of a Wallet ID owner (or at least provides data points from which viewers of the public blockchain can potentially deduce someone's identity). (*See id.*). For example, sometimes a user's IP address comes into view during off-chain transactions. (*Id.*).

The Ethereum blockchain charges "Gas Fees," which are fees paid in Ether on the Ethereum network and charged to wallets transacting on the Ethereum blockchain in order to compensate for the computing power and energy expended across the decentralized computer network. (*Id.* ¶ 55 n.7). This network maintains the distributed ledger in order to both process these transactions and to validate them such that they are then publicly viewable on the Ethereum blockchain. (*Id.*).

## B.    The Creation of LGBCoin

The LGBCoin cryptocurrency began when its founders minted 330 trillion LGBCoins using the Ethereum blockchain source code on October 28, 2021. (*Id.* ¶¶ 48, 51). The following individuals are allegedly founders or closely connected to

the founding of Defendant LGBCoin.io, the entity responsible for the LGBCoin: Defendant Koutoulas, Defendant Jeffrey R. Carter ("**Defendant Carter**"), Defendant Norden, and Defendant Michalopoulos—all these individuals are Florida residents who served as co-founders and spokesmen for LGBCoin.io. (*Id.* ¶¶ 23, 27, 29–30 (collectively the "**Executive Defendants**")). Defendant McLaughlin is a resident of Puerto Rico but also served as a co-founder and spokesman for the company. (*Id.* ¶ 31). All of these five individual Defendants at one point held LGBCoin in a wallet they owned, exercised control over LGBCoin.io, and directed or authorized the sale or solicitations of LGBCoin to the public. (*Id.* ¶¶ 23–31).

In addition, Defendant McLaughlin controls or is associated with three related entities, all of which were active in the crypto industry during the relevant time period: Defendant Coral DeFi, a Delaware Limited Partnership with a principal place of business in Puerto Rico; Defendant Coral Management, a related Delaware LLC with a principal place of business in Puerto Rico; and Defendant Coral Capital, a Puerto Rico LLC with its principal place of business in Puerto Rico. (*Id.* ¶¶ 31–35).

After being minted originally on October 28, 2021, the 330 trillion LGBCoins were dispersed to four deployer Wallet IDs controlled by Defendant Carter: Carter Wallet 1 had 164.9 trillion LGBCoin; Carter Wallet 2 had 33 trillion LGBCoins; Carter Wallet 3 had 132 trillion LGBCoins; and Carter Wallet 4 had 100 billion LGBCoins. (*Id.* ¶¶ 52–53). None of these four Carter Wallets was locked smart

contract wallets, which would ensure that for a period of time during a crypto currency's initial sale to the public insiders could not immediately sell their tokens acquired at low costs to the public when trading volume increases. (*Id.* ¶ 53).

On or around October 29, 2021, Carter Wallet 4 received three different Gas Fee transfers to facilitate the public transfer and sale of LGBCoin upon public launch, one of which came from a wallet controlled by Defendant Michalopoulos (the "**Michalopoulos Wallet**"). (*Id.* ¶¶ 54–55).

On November 1, 2021, Koutoulas received 1 trillion LGBCoins at a wallet, which he controlled (the "**Koutoulas Wallet**") from Carter Wallet 4. (*Id.* ¶ 56). That day, a pass-through hub wallet (the "**Hub Wallet**") was set up to facilitate the public sale of LGBCoins. (*Id.* ¶¶ 56–57 nn.8–9). Defendant Koutloulas sent several thousand dollars of gas fees to the Hub Wallet. (*Id.*). Defendant McLaughlin and his company, Defendant Coral DeFi control a wallet which also sent thousands of dollars of Gas Fees to the Hub Wallet. (*Id.*). And Carter Wallet 1 sent several trillion LGBCoins to the Hub Wallet. (*Id.*).

On November 2, 2021, the Executive Defendants offered LGBCoin for sale to the public with a transaction volume of $100 million and an opening price of $0.000000034. (*Id.* ¶ 58).

### C. LGBCoin After Launch

Upon launch and throughout the relevant time period, Defendant LGBCoin.io and the Executive Defendants promoted LGBCoin as a collectible on its website: it was advertised as "inspiring positivity and patriotism" and

"grounded in a strong belief in the American dream and principles of freedom." (*Id.* ¶ 49). The LGBCoin.io website further highlighted Defendant Koutoulas as embodying the ideals of the LGBCoin. (*Id.* ¶ 60). In addition, LGBCoin.io and the Executive Defendants launched and promoted LGBCoin using LGBCoin.io's logo through various online mediums. (*Id.* ¶ 61). In a section titled "Our Sponsorship of [Defendant Brandon]," LGBCoin.io's website similarly praised Defendant Brandon and connected the LGBCoin to him, asserting that it was providing him with "financial resources." (*Id.* ¶ 62). Moreover, the LGBCoin.io website stated it was donating to conservative political causes. (*Id.* ¶ 63). However, LGBCoin's sale was not accompanied by a whitepaper, which often provides purchasers technical information regarding the new offering of a cryptocurrency in the industry. (*Id.* ¶ 59).

Put simply, Plaintiffs allege that this promotional activity—detailed more specifically below—had an additional financial purpose despite LGBCoin's express admonitions that LGBCoin was just a collectible: to parlay enthusiasm for car racing and a political ethos into ever-increasing demand through the marketing of LGBCoin so that the relevant Defendants could benefit at the expense of those purchasing the LGBCoin at inflated prices. (*See id.* ¶¶ 64–183).

### 1. The LGBCoin Rise

After launch, Defendant LGBCoin.io and at least Defendant Koutoulas repeatedly promoted LGBCoin by connecting it to Defendant Brandon, Defendant

BMS, and Defendant NASCAR[3] on social media. (*Id.* ¶¶ 65–70, 72). In addition, Defendant Koutoulas and Defendant Norden promoted LGBCoin in conservative-leaning media or social media by connecting it to or discussing it with prominent conservative politicians or political commentators. (*Id.* ¶¶ 86–119). Some of these politicians and commentators publicly supported LGBCoin on social media as well, including, for example, Brandon Leslie, David J. Harris, Candace Owens, and former Representative Madison Cawthorn. (*Id.* ¶¶ 86–115). LGBCoin valuations and trading volume demonstrably rose following some of these promotions. (*Id.* ¶¶ 93–94, 109).

In the midst of this public promotion, on November 11, 2021, Defendant LGBCoin.io posted the following message to social media:

> Hi everyone want to give a few project updates – we have about 60 people working on it already on our 10th day in existence, including some serious crypto OGs. We are working on implementing a smart contract vesting and locking mechanism to reduce peoples' concerns regarding the genesis wallets. We are also working on decentralizing these tokens and you'll see some movements of the genesis tokens in preparing them for the smart wallet locks and a major national sponsorship deal. Also, we have several major national media partnerships in the works as well as 10 influencers engaged. Again, please remember this project is a digital collectible and a digital way to express your support for the Let's Go Brandon movement, so please spend only what your budget allows (for some that's a t shirt, for others maybe it's a plane that says LGB on the tail), but do rest assured there's a ton of experienced, honest, and talented people working around the clock to make this the best damn collectible out there with goals of showing America how much we love her.

---

[3] Defendant NASCAR is a Florida resident with its principal place of business in Florida. (*Id.* ¶ 38).

(*Id.* ¶ 71).

      Defendant LGBCoin.io continued to post social media teasers on November 21, 2021, November 23, 2021, December 2, 2021, and December 3, 2021 about an impending sponsorship, some of which pictured race cars and/or Defendant Brandon. (*Id.* ¶¶ 72–73). On December 23, 2021, former Defendant Mascioli[4] posted a grayed picture of Defendant Brandon's NASCAR car with the caption: "Pumped for the 2022 NASCAR Xfinity season. What will be the new paint scheme for the season on [Defendant Brandon and Defendant BMS's] car? You'll know soon enough." (*Id.* ¶ 74). Conservative commentators and politicians including David Harris, Madison Cawthorn, and Brandon Leslie also expressly teased an upcoming announcement around this time. (*Id.* ¶¶ 105–16). While discussing LGBCoin with some of these commentators, Defendants Koutoulas and Norden both touted the cryptocurrency's massive growth: Koutoulas stated, "the [LGBCoin's] five weeks old, we've been trading around $340 million in market cap" around December 14, 2021, and Norden similarly said it had gone from "$0 to $330 million" on December 28, 2021. (*Id.* ¶¶ 88–89). Moreover, Representative Cawthorn posted "Tomorrow we go to the Moon!" on one of Defendant Koutoulas's social media pictures, which Plaintiffs allege indicates that Defendant Koutoulas gave Representative Cawthorn insider information so he could sell into the rising demand before bad news would soon strike. (*Id.* ¶ 179). Plaintiffs further allege

---

[4] Defendant Mascioli was voluntarily dismissed without prejudice from the case. (Docs. 193, 194).

that Defendant LGBCoin.io and/or the Executive Defendants gave compensation, including LGBCoins, to some of these public figures in exchange for its promotion. (*Id.* ¶¶ 86–119).

On December 29, 2021, Defendants Brandon and BMS posted a teaser about an impending announcement the following day. (*Id.* ¶¶ 75–76). The news was posted the next day to Defendant LGBCoin.io, Defendant Brandon, Defendant Koutoulas, and Defendant BMS's social media accounts that Defendant LGBCoin.io would be Defendant Brandon's sponsor in the upcoming NASCAR season; this announcement included pictures of Defendant Brandon's car with the LGBCoin.io logo. (*Id.* ¶¶ 77–78). Defendant Koutoulas informed the media in an article published the next day on December 31, 2021 that he and Defendant LGBCoin.io had "put together proposed car designs a month or so ago before any of this happened because we thought [Defendant Brandon] was obviously the best guy to naturally do a national sponsorship with. So we had it ready to go." (*Id.* ¶ 79).

In the 24 hours leading up to Defendant BMS, Brandon, and LGBCoin.io's sponsorship announcement and the subsequent twenty-four hours, the value of a single LGBCoin increased 64%: from $0.00000098 on December 29, 2021, to $0.000001646 the morning of December 31, 2021. (*Id.* ¶ 80). On January 1, 2022, LGBCoin reached a maximum price of $0.000001734, which represents a 510% increase from its initial price of $0.00000034. (*Id.* ¶ 119). There were also 5,281 unique account holders of LGBCoin the day before the sponsorship announcement

and 10,257 unique account holders of LGBCoin by January 4, 2022. (*Id.*). At its height, LGBCoin reached a market value of more than $570 million with a liquidity pool of $6.5 million. (*Id.*).

### 2. *The LGBCoin Fall*

On January 4, 2022, Defendant NASCAR announced that the sponsorship was not approved, and by the end of that day, LGBCoin had fallen 63% to a low of $.0000005992 with a trading volume of $2.6 million. (*Id.* ¶ 121). This announcement came despite Defendant NASCAR's knowledge of the efforts of Defendant LGBCoin.io, the Defendant Executives, Defendant Brandon, and Defendant BMS to reach a sponsorship deal going back to at least November 5, 2021. (*Id.* ¶¶ 81–86, 211–13). While Defendant NASCAR refused to allow the phrase "Let's Go Brandon!" on a car, Defendant Koutoulas reported the parties reached an understanding that using just LGBCoin.io would lead to approval of a sponsorship based on the representation of an unnamed NASCAR executive. (*Id.* ¶¶ 211–14). In addition, Defendant NASCAR and its agents at least once stated in a December 26, 2021 email that "the sponsors are approved." (*Id.* ¶ 85). Defendant Brandon and Defendant BMS continued to express an intent to build Defendant LGBCoin.io's brand, and Defendant LGBCoin.io continued to promote its connection to Defendant Brandon and Defendant NASCAR. (*Id.* ¶¶ 124–26). As such, Plaintiffs allege Defendant NASCAR did not take sufficiently meaningful steps to distance itself from this renewed sponsorship agreement (*Id.* ¶ 126).

The promotion of LGBCoin—both before and after Defendant NASCAR's announcement—allegedly provided sufficient LGBCoin trading volume for Defendants Brandon, Koutoulas, Norden, and McLaughlin to sell their LGBCoins at a significant profit. (*Id.* ¶¶ 130–31). For example, Defendant McLaughlin allegedly gained almost $1 million from his sale of LGBCoins from November 2021 through January 2022. (*Id.* ¶¶ 131–48). Defendant Coral DeFi also made significant gains from its sales at this time. (*See id.* ¶¶ 151–57). Defendants Carter and Koutoulas likewise allegedly made gains of about $1.5 million on similar sales from the Hub Wallet from November 1, 2021 to January 2022. (*Id.* ¶¶ 163–70). These sales by the relevant Defendants were allegedly followed by low daily trading volume, and the low price caused LGBCoin to become functionally worthless. (*Id.* ¶ 182). Indeed, on January 28, 2022, the Executive Defendants took a snapshot of LGBCoin and then drained its remaining liquidity as part of a plan to remint and relaunch the LGBCoin into a second cryptocurrency playing off the "LGB!" phenomena; this caused both the price and transaction volume of LGBCoin to plummet to near $0 by January 30, 2022. (*Id.* ¶ 184). Defendant LGBCoin.io announced its intention that all LGBCoin owners would be issued a corresponding number of new tokens on social media that day. (*Id.* ¶¶ 185, 289). LGBCoin relaunched in late February of 2022 at the direction of the Executive Defendants, but Defendant LGBCoin never followed through such that not all owners of LGBCoin received corresponding tokens in the new crypto project, including Plaintiffs. (*Id.* ¶¶ 188, 290–91).

During this time, Plaintiff Eric De Ford, a resident and citizen of Missouri, purchased LGBCoins in several transactions dating December 31, 2021, January 1, 2022, January 11, 2022, January 26, 2022, and January 28, 2022. (*Id.* ¶ 14). Plaintiff Sandra Bader, a resident and citizen of Idaho, purchased LGBCoins on January 1, 2022. (*Id.* ¶ 15). Plaintiffs both allege they suffered investment losses as a result of Defendants' conduct. (*Id.* ¶¶ 14–15).

### D.    Procedural Posture

Consequently, Plaintiffs filed this putative class action to seek to recover their and the potential class's losses. (Doc. 1). After amending the Complaint once as a matter of course (Doc. 21) and the Court dismissing the Amended Complaint as an impermissible shotgun pleading (Doc. 63), Plaintiffs filed the instant Second Amended Complaint which alleges eight counts for relief against more than ten Defendants, some of which have since settled with Plaintiffs. (Docs. 211, 212, 213).

Count I alleges common law fraud against Defendant NASCAR for 11/5 approval. (Doc. 74, ¶¶ 1–12, 43–47, 65–85, 120–21, 210–28). Alleged in the alternative to Count I, Count II alleges common law fraud against Defendants LGBCoin.io, Koutoulas, and BMS. (*Id.* ¶¶ 1–38, 43–183, 229–44). Count III alleges common law fraud against NASCAR for its alleged approval of the LGBCoin.io sponsorship of Defendants Brandon and BMS. (*Id.* ¶¶ 1–12, 43–47, 65–85, 120–21, 245–62). Count IV alleges a civil conspiracy against all remaining Defendants except Defendant NASCAR. (*Id.* ¶¶ 1–38, 43–80, 86–183, 263–70). Count V alleges unjust enrichment against the Executive Defendants and the Coral

Defendants. (*Id.* ¶¶ 1–38, 43–83, 86–196, 271–74). Count VI alleges a violation of the Federal Securities Act's § 12(a)(1) regulation of certain sales of securities against Defendant LGBCoin.io and the Executive Defendants. (*Id.* ¶¶ 43–64, 120–21, 131–70, 197–200, 275–87). Count VII alleges another count of common law fraud against Defendant LGBCoin.io and the Executive Defendants. (*Id.* ¶¶ 1–38, 43–64, 120–21, 184–96, 288–92). Count VIII alleges a conversion claim against Defendant LGBCoin.io and the Executive Defendants. (*Id.* ¶¶ 1–38, 43–64, 120–21, 184–96, 293–300).

The following Defendants now seek dismissal of various claims against them: the Coral Defendants seek dismissal of Counts IV and V against them for lack of personal jurisdiction or, in the alternative, for failure to state a claim (Doc. 112); Defendant NASCAR seeks dismissal of Counts I and III for failure to state a claim (Doc. 90); Defendant Koutoulas seeks dismissal of Counts II, IV, V, VI, VII, and VIII for failure to state a claim (Doc. 101); and Defendant Norden seeks dismissal of Counts IV, V, VI, VII, and VIII (Doc. 104). After responsive briefing (Docs. 102, 114, 115, 123), this matter is ripe for review.

## II.   STANDARDS OF REVIEW

### A.    Personal Jurisdiction

When a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2),[5] the plaintiff must allege facts sufficient to establish that the court

---

[5]   The Coral Defendants improperly state their request is governed by Federal Rule of Civil Procedure 12(b)(1), which provides for dismissal due to lack of subject-matter jurisdiction; their brief, however, argues for dismissal due to lack of personal jurisdiction, which is

has personal jurisdiction over the defendant and to rebut a defendant's assertion that jurisdiction over him is improper. *Smith v. Trans-Siberian Orchestra*, 689 F. Supp. 2d 1310, 1313 (M.D. Fla. 2010) (citing *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000)). If a defendant produces affidavits or other competent evidence showing that personal jurisdiction would be inappropriate, however, the burden shifts to the plaintiff to substantiate its claims with its own competent evidence "unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006); *see also Future Tech. Today*, 218 F.3d at 1249. Where the allegations in the complaint and the defendant's proffer of evidence conflict, the court "must construe all reasonable inferences in favor of the plaintiff." *Stubbs*, 447 F.3d at 1360.

District courts in the Eleventh Circuit apply a two-prong test to determine whether personal jurisdiction exists over a defendant. *Mutual Serv. Ins. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004); *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). The court must first determine whether the plaintiff has alleged sufficient facts to subject the defendant

---

provided for under Federal Rule of Civil Procedure 12(b)(2). (Doc. 112, p. 9). In the interest of fairness, the Court construes the Coral Motion as proceeding under Rule 12(b)(2).

to the forum state's long-arm statute. *See Future Tech. Today*, 218 F.3d at 1249.[6] If jurisdiction is established under the forum state's long-arm statute, the court must then decide whether the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.*

**B.      Failure to State a Claim**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, to survive a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). However, though a complaint need not contain detailed factual allegations, pleading mere legal conclusions, or "a formulaic recitation of the elements of a cause of action," is not enough to satisfy the

---

[6]     In examining this first prong, the district court must construe the state's long-arm statute in the same manner as the state's supreme court. *See Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1265 (11th Cir. 1998).

plausibility standard. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In sum, the court must: reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; accept well-pled factual allegations as true; and view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79.

## C.   Pleading Claims of Fraud With Particularity

Claims of fraud in federal court are subject to the Federal Rules of Civil Procedure's heightened pleading standard under Rule 9(b) which requires that plaintiffs plead these claims "with particularity;" this means "identifying the who, what, when, where, and how of the fraud alleged." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)). "Malice intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." FED. R. CIV. P. 9(b). This heightened pleading standard ensures a dual purpose: first, it "alert[s] defendants to the precise misconduct with which they are charged" and second, it "protect[s] defendants against spurious charges of immoral and fraudulent behavior." *Id.* (quoting *Ziemba v. Cascade Int'l., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

## III. DISCUSSION

The Court preliminarily addresses why the Coral Defendants' request for dismissal due to lack of personal jurisdiction is successful. The Court then turns to the sufficiency of the allegations supporting the claims Defendants Koutoulas, Norden, and NASCAR hope to dismiss. First, the Court inspects whether Plaintiff has properly alleged the four common law fraud claims in Counts I, II, III, and VII against Defendants NASCAR, Koutoulas, and Norden. Second, the Court tests the sufficiency of the remaining alleged claims against Defendants Koutoulas and Norden.

### A. Personal Jurisdiction Over Coral Defendants

Plaintiffs assert the Court has specific rather than general jurisdiction over the Coral Defendants. (*See* Doc. 74, ¶¶ 40–41). The Coral Defendants disagree; they argue that Florida's long-arm statute does not apply to them because their alleged actions are not sufficiently or specifically connected to Florida, or that the exercise of personal jurisdiction over them by this Court would not comport with Due Process because their minimum contacts are not sufficiently related to Plaintiffs' claims. (Doc. 112).

#### 1. *The Long-Arm Statute*

Florida's long-arm statute affords for specific jurisdiction over persons who have "commit[ted] a tortious act within the state." FLA. STAT. § 48.193(1)(a)(2).[7]

---

[7] Plaintiffs do not attempt to rebut the Coral Defendants' assertion that § 48.193(1)(a)(1) of Florida's long-arm statute does not apply to them. FLA. STAT. § 48.193(1)(a)(1); (Doc. 112, p.

This provision is broadly construed as it permits specific jurisdiction over a non-resident defendant who commits a tort outside of the state that causes injury inside the state. *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999).[8] In addition, when a conspiracy is at issue:

> Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where *any other co-conspirator commits an act in Florida* in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida.

*United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281–82 (11th Cir. 2009) (collecting Florida cases) (emphasis added).

The Coral Defendants argue the principal problem with applying this provision of Florida's long-arm statute to them is "the lack of connection between the alleged conspiracy and the State of Florida." (Doc. 112, p. 19).[9] Despite this, Defendants concede that at least some of the alleged acts promoting LGBCoin by some of the alleged co-conspirators occurred in Florida. (Doc. 112, p. 19; Doc. 74, ¶¶ 23, 27, 29–30, 38, 87–88, 95, 114–16, 186). This is enough to bring the Coral Defendants within the reach of Florida's long-arm statute. *Mazer*, 556 F.3d at

16; *see* Doc. 123, pp. 7–8). Considering this argument is essentially unopposed, the Court summarily accepts it.

[8] Since *Posner* was decided, the Eleventh Circuit has continued to apply this broad construction. *See, e.g.*, *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). Moreover, the Florida Supreme Court has declined to decide the issue of whether injury alone satisfies the tortious acts provision of the long-arm statute. *See Wendt v. Horowitz*, 822 So. 2d 1252, 1253 n.2 (Fla. 2002); *see also Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1206 n.6 (Fla. 2010).

[9] Defendants further argue the conspiracy claim is weak, but this assertion has little bearing on the personal jurisdiction analysis. Instead, this argument will be addressed in the failure to state a claim analysis below. (Doc. 112, p. 19).

1281–82; *Machtinger v. Inertial Airline Servs., Inc.*, 937 So. 2d 730, 734–36 (Fla. 3d DCA 2006) (finding personal jurisdiction existed in Florida where conspiracy was made in Ohio but acts in furtherance of the conspiracy were done in and directed toward Florida).

### 2.    *The Due Process Inquiry*

Personal jurisdiction must also comport with the Due Process Clause of the Fourteenth Amendment. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). "The canonical decision in this area remains [*International Shoe*]. There, the Court held that a tribunal's authority depends on the defendant's having such contacts with the forum State that the maintenance of the suit is reasonable and does not offend traditional notions of fair play and substantial justice." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (internal quotation marks and citations omitted). The Eleventh Circuit operationalized the doctrine into a three-part test wherein a court considers:

> (1) whether the plaintiff's claims arise out of or relate to the defendant's contacts with the forum; [(the "**Relatedness Prong**")];
>
> (2) whether the nonresident defendant has purposefully availed itself of the forum; [(the "**Purposeful Availment Prong**")]; and
>
> (3) whether applying personal jurisdiction comports with traditional notions of fair play and substantial justice [(the "**Fair Play Prong**")].

*Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (citations and internal quotations omitted). Because the Court finds Plaintiffs did

not satisfy their burden to establish the Relatedness Prong, the Court declines to analyze the final two prongs.

The Relatedness Prong assesses whether a "plaintiff's claim . . . arise[s] out of or relate[s] to at least one of defendant's contacts with the forum." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222 (11th Cir. 2009) (internal quotations omitted). The Eleventh Circuit had previously "held that a tort 'arises out of or relates to' the defendant's activity in a state only if the activity is a 'but-for' cause of the tort." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1314 (11th Cir. 2018) (quoting *Oldfield*, 558 F.3d at 1222–23).

However, the U.S. Supreme Court recently rejected the Eleventh Circuit's but-for causation requirement, explaining that the first half of the "arise out of or relate to" standard (i.e., "arise out of") requires causation, but the second half (i.e., "relate to") "contemplates that some relationships will support jurisdiction without a causal showing." *Ford*, 141 S. Ct. at 1026. Although a causal relationship is not required, the Supreme Court noted that this "does not mean anything goes" because "[t]he phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

Applying this framework to the facts of the *Ford* case, the Supreme Court ruled that personal jurisdiction was present "because [the defendant] Ford had systematically served a market in [the forum States] for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States." *Id.* at 1028. In other words, "there [was] a strong relationship among the defendant, the forum,

and the litigation—the essential foundation of specific jurisdiction." *Id.* (citation and internal quotations omitted).

Here, the Court stresses that the Coral Defendants and the Plaintiffs are not residents of Florida and thus, that no harm or loss to Plaintiffs is alleged to have occurred in Florida: Plaintiffs are residents of Missouri and Idaho, they never identify their physical location upon purchase of any LGBCoin, and the Coral Defendants are either Delaware or Puerto Rico residents. *See id.*; (Doc. 74, ¶¶ 14–15, 31–35). While most of the specific allegations against the Coral Defendants involve the sale or transfer of LGBCoin on the blockchain, none of these online transactions allegedly caused harm to or touched in any way parties specifically in Florida. (Doc. 74, ¶¶ 132–57). Granted, Plaintiffs allege the Coral Defendants engaged in the online distribution of LGBCoins to online wallets and connect that to the extensive publicity campaign around which the conspiracy allegations hinge and which took place at least in part in Florida. (*Id.*). But Plaintiffs have produced no caselaw demonstrating the alleged acts of co-conspirators satisfy the Due Process clause's Relatedness analysis for non-resident Defendants who have no other alleged contacts with the forum *when the Plaintiffs themselves were not allegedly present or harmed there*. (*See* Doc. 123, pp. 8, 18–20).

More concerning, Plaintiffs' entire response in opposition for the Due Process analysis, let alone the Relatedness analysis, is sparse to say the least. (*See id.*). Plaintiffs spend most of their response on this issue raising newly alleged contacts that Coral Defendants have with the forum, but even these allegations are

not connected to Plaintiffs' claims or the LGBCoin offerings. (*Id.* at pp. 18–20). Without more, this showing is insufficient. These allegations are nowhere pled in the Second Amended Complaint; in fact, Plaintiffs' response on this issue is altogether bereft of citations to the Second Amended Complaint. The most Plaintiffs muster is the conclusory assertion that the Coral Defendants have a "substantial connection" to Florida, but this "substantial connection" is never explained. Moreover, the only case cited is not on point as the plaintiffs therein were harmed directly in Florida by the acts of a foreign defendant, not by alleged co-conspirators in another state. (*Id.* at p. 20); *Fru Veg Mktg., Inc. v. Vegfruitworld Corp.*, 896 F. Supp. 2d 1175, 1181 (S.D. Fla. 2012). As Plaintiffs bear the burden of establishing the Relatedness Prong, this is fatal. *See Louis Vuitton*, 736 F.3d at 1355 (citing *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).[10]

## B. Counts I, II, III, and VII: Common Law Fraud

The Court first addresses the standard for common law fraud in Florida and then applies it to Counts I, II, II, and VII in turn.

---

[10] The Court's conclusion here forecloses analysis on the Coral Defendants' additional argument that Plaintiffs fail to state a claim against them. (Doc. 112, pp. 24–31). Nevertheless, the Court notes that the allegations against Defendant Coral Capital and Defendant Coral Management are entirely conclusory. Both of these parties are identified and included as part of the Coral Defendants, but their role is never further elaborated on. (*See* Doc. 74, ¶¶ 32–33, 35). This is in contrast to the other Coral Defendants, Defendant McLaughlin and Defendant Coral DeFi, that play at least a discernible role in the rest of the allegations—even if those allegations are not enough to give the Court personal jurisdiction over them. (*Id.* ¶¶ 57, 131–58, 186–87).

### 1. *Florida Common Law Fraud*

According to the Eleventh Circuit, the elements of common law fraud under Florida law are "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) the consequent injury by the party acting in reliance on the representation." *Omnipol*, 32 F.4th at 1307 (quoting *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)); *see also Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir. 2007) (noting under Rule 9(b), a party alleging fraud must "state with particularly the circumstances constituting fraud" and a complaint must contain facts which establish (1) the precise statements, documents, or misrepresentations made, (2) the time and place of, and person responsible for the statement, (3) the content and manner in which the statements misled the Plaintiff, and (4) what the Defendant gained by the alleged fraud).

### 2. *Count I: Defendant NASCAR's November Approval*

Count I fails for a couple of reasons. First, the allegations never identify with sufficient specificity who made the alleged statements attributable to Defendant NASCAR. Plaintiffs confusingly claim the statements were made by either an "unnamed NASCAR official" (Doc. 74, ¶ 212) or unspecified "NASCAR executives." (*Id.* ¶¶ 213–14). The greater issue, however, is the agent "who" made the statement attributable to Defendant NASCAR is not sufficiently identified. *Omnipol*, 32 F.4th at 1307. While it might be possible to allege with specificity without knowing the

precise identity of the speaker in question, this does not appear to be an instance where almost everything but the speaker's name is known.

Second, Count I fails because Defendant NASCAR may have given preliminary approval for the sponsorship as alleged, (Doc. 74, ¶¶ 212–14), but that does not make the approval statement a false misrepresentation if Defendant NASCAR changed course in good faith. In other words, the Second Amended Complaint does not provide even general insight into the element of knowledge of falsity. Even if it did, Plaintiffs fail to allege what Defendant NASCAR intended or hoped to gain *by inducing Plaintiffs' reliance* on these statements. *Ambrosia*, 482 F.3d at 1316–17. Regardless, the Court agrees with Plaintiffs that this failure does not yet warrant dismissal with prejudice, and Plaintiffs should have one more opportunity to replead and remedy these errors.

3.   *Count II: Defendant Koutoulas[11] and the November Approval*

Pled in the alternative to Count I under Federal Rule of Civil Procedure 8(d)(2), Plaintiffs allege that instead of Defendant NASCAR making false

---

[11] The Court rejects Defendant Norden, Defendant Koutoulas, and the Coral Defendants' assertions (Docs. 101, 104, 123) that the Second Amended Complaint still constitutes an impermissible shotgun pleading after the Court's dismissal of the First Amended Complaint for the same reason. (Doc. 63). While the Second Amended Complaint is not a model of clarity, it is now sufficient to put the Defendants on notice of the claims against them. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."). Although grouping various defendants together is not necessarily advisable, as long as the parties can discern which claims are matched with which defendants, this is enough to put a defendant on notice so they can mount their defense. *Id.* at 1321–23. Defendants were able to mount such a defense here.

statements that Defendant LGBCoin.io would be able to sponsor Defendants Brandon and BMS by including the company's logo and branding on his car, that instead Defendant Koutoulas made such false representations after Defendant NASCAR expressly disclaimed the sponsorship. (Doc. 74, ¶¶ 211–15, 231–33). Many of these statements to the public and thus to Plaintiffs are alleged with specificity as to the who, what, when, where, and how because Defendant Koutoulas's social media posts and the documented comments to various political commentators and politicians are alleged repeatedly with dates and the attendant context.[12] (*Id.* ¶¶ 43–183, 231–34).[13] Moreover, the statements that there would be a partnership between Defendant LGBCoin.io and Defendants BMS, Brandon, and NASCAR was false: as alleged in Count II, Defendant NASCAR stated it would never approve the sponsorship. (*Id.* ¶¶ 121, 231–34).

Plaintiffs further allege that due to Defendant Koutoulas status as an investment professional with legal training, he knew the promotional activities and specific statements made were misleading and improperly inducing retail investors such as the Plaintiffs to purchase LGBCoins in a way that ended up causing them harm. (*See id.* ¶¶ 171–72). The Court disagrees with Plaintiffs, however, that statements made by other Defendants, even Defendant LGBCoin.io,

---

[12] Defendant Koutoulas can rest assured that the political content of his beliefs has nothing to do with the Court's conclusions. (Doc. 101, p. 3). The Court would reach the same result were his actions taken relative to, say, hypothetical "Greta Thunberg Coins."

[13] The Court disagrees that citing to a bevy of previous allegations, many of which include Defendant Koutoulas's specific statements, by itself does not satisfy the requirement that Plaintiffs satisfy the particularity pleading requirement. (*Id.* at p. 19). Paradoxically, sometimes the volume of allegations enhances specificity rather than obscures it.

cannot satisfy Plaintiffs' burden with respect to alleging its claims with particularity against Defendant Koutoulas. (Doc. 114, p. 7).

### 4.    *Count III: Defendant NASCAR's December 26 Approval*

Count III is closer to the mark than Count I. This time, the Defendant NASCAR speaker is expressly identified: Defendant NASCAR employee Dale Howell communicated preliminary approval of the sponsorship of Defendant Brandon in a December 26, 2021 email to an agent of Defendant LGBCoin.io. (Doc. 74, ¶¶ 85, 246). The Court agrees with Defendant NASCAR, though, that this still isn't enough to meet the specificity pleading requirement. First, Plaintiffs misstate the knowledge element. *Compare* (*id.* ¶ 247) ("Dale Howell either made this representation without knowledge of its truth or falsity or should have known that the representation was false."), *with Omnipol*, 32 F.4th at 1307 (requiring the representor's knowledge that the representation is false). Furthermore, the pleadings and Plaintiffs' response still do not adequately clarify how this statement was intended by Defendant NASCAR to induce the reliance *of Plaintiffs*, not representatives of Defendant LGBCoin.io. *Omnipol*, 32 F.4th at 1307; (Doc. 74, ¶¶ 249–51).

### 5.    *Count VII: Defendants Koutoulas and Norden's Fraudulent Participation in the January 28 Relaunch*

As for the January 28 Relaunch fraud allegations, Plaintiffs made only one purchase of LGBCoins on January 28, 2022 that could plausibly qualify as an injury caused by acting in reliance on any connected misrepresentations: on this

date, Defendant LGBCoin.io released an allegedly false statement via social media on this date that it would swap current LGBCoin holders' tokens for new ones. (Doc. 74, ¶¶ 14, 184–185). While this statement may have been alleged as false with sufficient particularity, it is not even plausibly attributable to either Defendants Koutoulas or Defendant Norden—the speaker is clearly the entity, Defendant LGBCoin.io. *Ambrosia*, 482 F.3d at 1317 (noting that when multiple defendants are involved, the complaint must inform each defendant of the "nature of his alleged participation in the fraud"). No similar statements are ever alleged with specificity against Defendant Norden in 2022, and Defendant Koutoulas does not make any alleged statements with respect to the relaunch of LGBCoin until at least February of 2022—too late to affect the purchase on January 28, 2022. (*See id.* ¶¶ 188–96, 289–92). As such, Count VII should be dismissed with prejudice as to Defendants Norden and Koutoulas.

## C. Counts IV, V, VI, and VIII Against Defendants Koutoulas & Norden

The Court finally inspects the sufficiency of the remaining claims against Defendant Koutoulas and Norden: first, the civil conspiracy claim; second, the unjust enrichment claim; third, the federal securities claim; fourth and finally, the conversion claim.

### 1. Count IV: Civil Conspiracy

To state a claim for civil conspiracy, a plaintiff must allege: 1) an agreement between two or more parties; 2) to achieve an illegal objective; 3) an overt act in

furtherance of that illegal objective; and 4) resulting injury. *Tucci v. Smoothie King Franchises, Inc.*, 215 F. Supp. 2d 1295, 1300 (M.D. Fla. 2002) (citing *Bivens Gardens Off. Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 912 (11th Cir. 1998)); *Mazer*, 556 F.3d at 1271 (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008)). In addition, the heightened pleading requirement of Rule 9(b) applies to conspiracy claims where, as here, two or more parties allegedly agreed to commit fraud. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067–68 (11th Cir. 2007); (Doc. 74, ¶ 265).

Defendants Koutoulas and Norden argue that the allegations of an agreement to achieve the fraudulent objective of juicing demand for LGBCoin to provide them an opportunity to sell the initially minted crypto are too general to satisfy the particularized pleading requirements of Rule 9(b). (Doc. 101, pp. 22–23; Doc. 104, pp. 14–17). The Court agrees with respect to Defendant Norden. While the Second Amended Complaint contains loose allegations pertaining to other Defendants as to alleged conspiratorial agreements, none of those allegations apply to Defendant Norden; at most he plausibly appeared to be a spokesperson enthusiastically in favor of LGBCoin based on the well-pled allegations, not a fraudster trying to pull one over on purchasers like Plaintiffs. (Doc. 74, ¶¶ 4, 5, 69, 81, 186, 211–13, 246–49).

As for Defendant Koutoulas, Plaintiffs vaguely assert "upon information and belief" that Mr. Koutoulas entered into an unlawful agreement with other Defendants to increase enhance market demand for LGBCoin while

simultaneously selling to these new purchasers. (*Id.* ¶ 265). However, allegations amounting to "parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest a conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1319 (S.D. Fla. 2014). With Defendant Koutoulas's conduct just as consistent with parallel conduct and accompanied only by general allegations of conspiracy, the Court must dismiss the claims against him. Because Plaintiffs may be able to remedy this deficiency, the Court will, however, give leave to replead.

### 2. *Count V: Unjust Enrichment*

"[A] claim for unjust enrichment is an equitable claim based on a legal fiction which implies a contract as a matter of law even though the parties to such an implied contract never indicated by deed or word that an agreement existed between them." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1129 (11th Cir. 2019) (quoting *14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc.*, 43 So. 3d 877, 880 (Fla. 1st DCA 2010)). Under Florida law, a plaintiff stating a claim for unjust enrichment must allege (1) the plaintiff has conferred a benefit on the defendant, (2) the defendant voluntarily accepted and retained that benefit, and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof. *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (citing *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)).

### a.   Defendant Koutoulas

Defendant Koutoulas argues that Plaintiffs did not properly allege the conferral of a direct benefit upon him. (Doc. 101, p. 24). Contrary to Defendant Koutoulas's assertion, there is a split of authority on how direct the benefit conferred must be to satisfy the unjust enrichment test in Florida. *Compare MacMorris v. Wyeth, Inc.*, No. 04-cv-596, 2005 WL 1528626, at *1 (M.D. Fla. June 27, 2005), *with Fagan v. Cent. Bank of Cyprus*, No. 19-80239-civ, 2021 WL 2845034, at *15 (S.D. Fla. June 28, 2021). However, neither the Eleventh Circuit nor the Florida Supreme Court have ever expressly held that the benefit be conferred directly in one step. *See Virgilio*, 680 F.3d at 1337 (no direct benefit requirement); *Fla. Power Corp.*, 887 So. 2d at 1241 n.4 (no direct benefit requirement). In this case, although Plaintiffs allegedly purchased LGBCoin through exchanges, the distributed ledger of the Ethereum blockchain provides an immutable record to check if Plaintiffs conferred a sufficiently direct benefit on Defendant Koutoulas through their purchase of LGBCoin, which is at least plausible given his considerable alleged position in the initial minting of LGBCoins. (Doc. 74, ¶¶ 48–57, 150–52, 272). Plaintiffs' additional allegations that Defendant Koutoulas voluntarily accepted and retained this benefit to their detriment is sufficiently supported by the entirety of the pleadings to make them at least plausible. (*Id.* ¶¶ 43–83, 86–196). As such, the claim survives the Koutoulas Motion.

### b. *Defendant Norden*

Conversely, the Court agrees with Defendant Norden that the Second Amended Complaint is wholly devoid of specific, non-conclusory allegations that the Plaintiffs ever conferred a benefit of any kind upon him. (Doc. 104, p. 18). In contrast to several other Defendants, there is no reference to Defendant Norden in the allegations regarding various transfers between crypto wallets, whether for acquiring or selling LGBCoins. (*See* Doc. 74, ¶¶ 132–70). While there is an allegation identical to the other Executive Defendants in the paragraphs identifying the various parties to the Second Amended Complaint that states Defendant Norden was "an LGBCoin holder" and that he "directed and/or authorized, directly or indirectly, the sale and/or solicitations of LGBCoin to the public," this boilerplate assertion is entirely conclusory without any more to accompany it. (*Id.* ¶ 29). As such, Count V against Defendant Norden is due to be dismissed with prejudice.

### 3. *Count VI: Federal Securities Fraud Under § 12(a)(1)*

§ 12(a)(1) of the Securities Act of 1933 provides a private right of action against any person who offers or sells a security in violation of § 5 of the Securities Act. 15 U.S.C. § 77l(a)(1). The following elements must be established to prevail on a § 5 claim: "(1) absence of an effective registration statement covering the securities in question; (2) the offer or sale of the securities; and (3) the use of the mails, or any means or instruments of transportation or communication in

interstate commerce in connection with the sale or offer." *Hodges*, 372 F. Supp. 3d at 1347–48.

A threshold issue in federal securities law is whether the offering in question qualifies as a "security" under § 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1). To that end, Plaintiffs allege LGBCoins are "investment contracts" under § 77b(a)(1). (Doc. 74, ¶ 278). The term "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). An offering is an investment contract if there is: (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits to come solely from the efforts of others. *Id.*

### a. *LGBCoin a Security?*

Defendant Koutoulas attacks this count head on and asserts that LGBCoin is not a security under federal securities law but instead, a meme coin to support free speech—in other words, he challenges that it is an investment with expectations of profit in a common enterprise. (Doc. 101, pp. 23–28). While an emerging issue, some cryptocurrencies have been found to be securities, others not—either way, the "investment contract" inquiry remains the same under the canonical *Howey* test. *See e.g.*, *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1347–48 (S.D. Fla. 2019). Thus, the Court turns to the *Howey* "investment contract" analysis.

The "investment of money" required for an "investment contract" need not be made in cash and refers more generally to "an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses." *SEC v. Friendly*, 49 F. Supp. 2d 1363, 1368–69 (S.D. Fla. 1999). Here, Plaintiffs paid either cash up front or paid in-kind by tendering other crypto assets such as Ether. (Doc. 74, ¶¶ 14–15, 279–80). Even with some of Defendant LGBCoin.io and Defendant Koutoulas's disclaimers to the contrary that, Plaintiffs plausibly and reasonably expected to be exposed to financial upside and downside, and this expectation flowed, at least in part, from Defendant Koutoulas's alleged public promotion of LGBCoin as an asset with significant upside. (Doc. 74, ¶¶ 66–79, 89, 99–100, 172–76, 281–82).

"[A] common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties.'" *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).[14] "The thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return" and so must rely on the work of others after handing over their assets. *Eberhardt v. Waters*, 901 F.2d 1578, 1580–81 (11th Cir. 1990). Here, "investors were led to believe that

---

[14] Defendant Koutoulas states this element "requires a showing of a common enterprise. The Eleventh Circuit has adopted the Vertical Approach to determine whether a common enterprise exists. *See, e.g.*, *In re Mona Lisa at Celebration, LLC*, 436 B.R. 179, 198 (Bankr. M.D. Fla. 2010)." (Doc. 101, p. 26). In fact, the case which Defendant Koutoulas cites expressly states the opposite, "A common enterprise also is possible where there is horizontal commonality involving a pooling of interests or profits in the transaction. *SEC v. Kirkland*, 521 F.Supp.2d 1281, 1292 (M.D. Fla. 2007)." *In re Mona Lisa*, 436 B.R. at 198 n.78.

as more individuals began using [LGBCoins] the value of [their] tokens would increase." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019). Moreover, it was not unreasonable for Plaintiffs and other purchasers to believe that the adoption of these crypto assets would increase their value due to the continued promotion of the LGBCoin by Defendant LGBCoin.io, Defendant Koutoulas, and others. (Doc. 74, ¶¶ 66–79, 89, 99–100, 172–76, 281–82).  Some courts have found this speculative reliance interest to be enough, and this Court agrees. *See e.g.*, *ATBCOIN*, 380 F. Supp. 3d at 354 (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (noting horizontal commonality exists where the fortunes of each investor are tied "to the success of the overall venture")).

Finally, when purchasers of crypto assets "reasonably believed that those coins would increase in value based primarily on Defendants' entrepreneurial and managerial efforts." *ATBCOIN*, 380 F. Supp. 3d at 355 (finding a marketing campaign highlighting potential profits from simply holding a crypto asset to satisfy the *Howey* test's third prong).  It is true that "[t]he mere presence of a speculative motive on the part of purchaser or seller does not evidence the existence of an investment contract." *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966). But when defendants convey to potential purchasers of an asset class that the anticipated return on their investment will be the result of those defendants' efforts to commercialize the asset, this can be enough. *ATBCOIN*, 380 F. Supp. 3d at 354 (finding speculative interest enough when purchasers believe based on defendant representations that

those defendants will commercialize the relevant crypto blockchain and crypto coins there).

Here, Plaintiffs and other reasonable purchasers reasonably anticipated such a return due to Defendant Koutoulas and others' efforts to commercialize LGBCoin. (Doc. 74, ¶¶ 66–79, 89, 99–100, 172–76, 281–82). Defendant Koutoulas's protestations that the efforts to make LGBCoin the official NASCAR sponsor of Defendants Brandon and BMS were simply a promotion of free speech and patriotic values accompanied by an attempt to help Defendant Brandon in hard times may, in fact, be the case. (Doc. 101, pp. 25–31). But at this procedural posture, the Court draws all reasonable inferences in Plaintiffs' favor, and as such, it is at least plausible that LGBCoin is a security based on the Second Amended Complaint. Therefore, LGBCoin qualifies as a security at this juncture under Section 2(a)(1) of the Securities Act, and the Court turns to whether Defendant Koutoulas and Defendant Norden are plausibly alleged to be "sellers" of this security in violation Section 12 of the Security Act.

### b. *Seller Liability*

Seller liability under Section 12 obtains in two different situations:  1) when a "seller" passes title directly or 2) when a seller offers or solicits the sales of securities resulting in purchase of those securities for value redounding to themselves. *Pinter v. Dahl*, 486 U.S. 622, 642 (1988) ("Had Congress intended liability to be restricted to those who pass title, it could have effectuated its intent

by not adding the phrase "offers or" when it split the definition of "sell" in § 2(3).").

After *Pinter* the Eleventh Circuit explained:

> participants in the transfer of securities who "solicit" a purchase may also be liable as "sellers" under section 12(1) of the 1933 Act—even though they do not own the securities. *Pinter,* 486 U.S. at 644[]. While the Court declined to expressly define "solicit," it explained that a participant whose motivation is solely to benefit the buyer cannot be deemed to have solicited a purchase. Instead, liability extends only to one who solicits a purchase *and* is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647[.]

*Ryder Int'l Corp. v. First Am. Nat. Bank*, 943 F.2d 1521, 1525–26 (11th Cir. 1991) (explaining scope of "seller" liability under Section 12(1) before and after *Pinter*). Defendants focus too narrowly on the first definition of "seller" under Section 12 to the exclusion of the latter. (Doc. 101, pp. 29–30; Doc. 104, pp. 19–21). The plaintiff must thus allege not only that the defendant actively solicited investors, but that the plaintiff purchased securities as a result of that solicitation and that this solicitor did so to serve their own financial interests. *Griffin v. Painewebber, Inc.*, No. 99CIV2292, 2001 WL 740764, at *1–2 (S.D.N.Y. June 29, 2000).

Defendant Koutoulas contends that mere social media posts cannot make him a seller of securities in the Eleventh Circuit. (Doc. 101, p. 30). Even if Defendant Koutoulas had only promoted LGBCoin through social media posts, this is incorrect. The Eleventh Circuit recently clarified:

> Technology has opened new avenues for both investment and solicitation. Sellers can now reach a global audience through podcasts, social media posts, or, as [t]here, online videos and web links. But under the district court's cramped reading [there] of the Securities Act, a seller who would be liable for recommending a security in a personal letter could not be held

> accountable for making the exact same pitch in an internet video—or through other forms of communication listed as exemplars in the Act, like circulars, radio advertisements, and television commercials. *See* 15 U.S.C. §§ 77e(a)(1), 77b(a)(10). That makes little sense. A seller cannot dodge liability through his choice of communications—especially when the Act covers "any means" of "communication." *Id.* § 77e(a)(1). We decline to adopt an interpretation that both contradicts the text and allows easy end-runs around the Act.

*Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022). Defendant Koutloulas's extensively documented alleged promotion of LGBCoin in-person or online in videos, on social media, and on podcasts are thus enough to make him a seller under Section 12(1). (Doc. 74, ¶¶ 66–79, 87–89, 99–100, 172–76, 281–82). Moreover, Defendant Koutoulas is plausibly alleged to have made these solicitations to serve his own financial interests. (*Id.* ¶¶ 163–70).

In contrast, no allegations show Defendant Norden received value or made these solicitations to serve his own financial despite allegations he promoted LGBCoin and thought it was, in total, worth several hundred million dollars in market capitalization. (*See* Doc. 74, ¶¶ 29, 88, 115–16, 175, 268). Thus, even when these sparse promotional allegations specifically mentioning Defendant Norden are included and all reasonable inferences are drawn in Plaintiffs' favor, Defendant Norden defeats this claim.

### 4. Count VIII: Conversion

The elements of conversion in Florida are: (1) an act of dominion wrongfully asserted, (2) over another's property, and (3) inconsistent with the plaintiff's ownership therein. *Mazer*, 556 F.3d at 1270 (citing *Thomas v. Hertz Corp.*, 890

So. 2d 448, 449 (Fla. 3d DCA 2004)). The cause of action accrues "where a person wrongfully refuses to relinquish property to which another has the right of possession," and it "may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action." *Id.* (quoting *Seymour v. Adams*, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994)).

### a.  *Defendant Koutoulas*

Normally, factual arguments on a motion to dismiss are inappropriate. *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) (pointing out that "[t]he scope of [] review must be limited to the four corners of the complaint" and the attachments thereto which are undisputed and central to the claim); *Austin v. Modern Woodman of Am.*, 275 F. App'x 925, 926 (11th Cir. 2008)[15] (noting courts may consider documents central to a claim whose authenticity is not in dispute). Defendant Koutoulas does not contest the facts in the Second Amended Complaint but instead explains that the "airdrop" of the new LGBCoin alleged on January 28, 2022, and on which the conversion claim is based, never divested Plaintiffs of their original LGBCoins; Plaintiffs still have access to them in whatever wallet they were originally stored. (Doc. 101, pp. 18–20). Most importantly, this assertion is supported by the Second Amended Complaint itself, which states that "[a]ccording to the Ethereum blockchain, [the wallet in question] continues to hold those

---

[15]  "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

LGBcoins as of the filing of this amended complaint." (Doc. 74, ¶ 136 n.56). If the Plaintiffs continue to hold the original LGBCoins, they have never been divested of their property. As such, Count VIII is due to be dismissed.

     *b.* *Defendant Norden*

   Even if this were not the case, the Court once again agrees with Defendant Norden that the Second Amended Complaint fails to plausibly allege an essential element of the claim against him. (Doc. 104, pp. 27–28). Specifically, no allegations come close to establishing Defendant Norden wrongfully asserted dominion over Plaintiffs' property. Count VIII against Defendant Norden thus also fails.

## IV. CONCLUSION

   Accordingly, it is **ORDERED AND ADJUDGED** as follows:

   1.  The NASCAR Motion (Doc. 90) is **GRANTED IN PART**;

     a.  Plaintiffs' claims against Defendant NASCAR are **DISMISSED WITHOUT PREJUDICE** with leave to replead;

   2.  The Koutoulas Motion (Doc. 101) is **GRANTED IN PART AND DENIED IN PART**;

     a.  With the exception of Count VII which is **DISMISSED WITH PREJUDICE**, Plaintiffs' claims against Defendant Koutoulas

are **DISMISSED WITHOUT PREJUDICE** with leave to replead;

3. The Norden Motion (Doc. 104) is **GRANTED**;

    a. Plaintiffs' claims against Defendant Norden are **DISMISSED WITH PREJUDICE** without leave to replead because the Court finds to do otherwise would be futile;

4. The Coral Defendants Motion (Doc. 112) is **GRANTED**;

    a. Plaintiffs' claims against the Coral Defendants are **DISMISSED WITHOUT PREJUDICE**;[16]

5. The Brandonbilt Defendants' Motion to Dismiss (Doc. 88) is **DENIED AS MOOT**;

6. Defendant Michalopoulos's Motion to Dismiss (Doc. 93) is **DENIED AS MOOT**;

7. The Clerk of Court is **DIRECTED** to terminate Defendants Erik Norden, Thomas McLaughlin, Coral Capital LLC, Coral Capital Management LLC, and Defendant Coral Defi LP only from the file; and

8. On or before April 14, 2023, Plaintiffs may file a Third Amended Complaint if they believe they can do so consistent with the directives

---

[16] Dismissal for lack of personal jurisdiction must be without prejudice so that litigation on the merits can proceed in a proper forum, but such a dismissal does act as a bar against further litigation regarding the Coral Defendants in the forum of dismissal itself. *See Posner*, 178 F.3d at 1221. As such, Plaintiff does not have leave to replead its claims against the Coral Defendants here in the Middle District of Florida.

of this Order and Rule 11. Failure to timely file a Third Amended Complaint will result in dismissal of the claims without further notice.

**DONE AND ORDERED** in Orlando, Florida on March 30, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties