# House Calendar No. __

117TH CONGRESS
*2d Session*　} HOUSE OF REPRESENTATIVES { 

REPORT

117–__

# IN THE MATTER OF ALLEGATIONS RELATING TO REPRESENTATIVE MADISON CAWTHORN

———

# R E P O R T

OF THE

# COMMITTEE ON ETHICS



December 6, 2022.—Referred to the House Calendar and ordered to be printed

———

U.S. GOVERNMENT PUBLISHING OFFICE

XX–XXX　　　　　WASHINGTON ː 2022

**ADOPTED BY THE COMMITTEE ON ETHICS ON DECEMBER 1, 2022**

**117TH CONGRESS, 2ND SESSION**
**U.S. HOUSE OF REPRESENTATIVES**
**COMMITTEE ON ETHICS**

**IN THE MATTER OF ALLEGATIONS RELATING TO**
**REPRESENTATIVE MADISON CAWTHORN**

**DECEMBER 1, 2022**

Ms. WILD, from the Committee on Ethics, submitted the following

**REPORT**

## COMMITTEE ON ETHICS

Susan Wild, Pennsylvania
*Acting Chairwoman*
Dean Phillips, Minnesota
Veronica Escobar, Texas
Mondaire Jones, New York

Michael Guest, Mississippi
*Acting Ranking Member*
Dave Joyce, Ohio
John H. Rutherford, Florida
Kelly Armstrong, North Dakota

## REPORT STAFF

Thomas A. Rust, *Chief Counsel/Staff Director*
Brittney Pescatore, *Director of Investigations*
David Arrojo, *Counsel to the Acting Chairwoman*
Kelle Strickland, *Counsel to the Acting Ranking Member*

Sydney R. Bellwoar, *Counsel*
Janet M. Foster, *Senior Counsel*
Caroline Taylor, *Investigator*
Peyton Wilmer, *Investigative Clerk*



# U.S. House of Representatives

### COMMITTEE ON ETHICS

### Washington, DC 20515

## LETTER OF TRANSMITTAL

December 6, 2022

The Honorable Cheryl L. Johnson
Clerk, House of Representatives
H-154, The Capitol
Washington, DC 20515

Dear Ms. Johnson:

Pursuant to clauses 3(a)(2) and 3(b) of Rule XI of the Rules of the House of Representatives, we herewith transmit the attached report, "In the Matter of Allegations Relating to Representative Madison Cawthorn."

Sincerely,

Susan Wild
Acting Chairwoman

Michael Guest
Acting Ranking Member

# C O N T E N T S

———————

I.   INTRODUCTION .................................................................................................... 1

II.  PROCEDURAL BACKGROUND ........................................................................ 3

III. FINDINGS AND CONCLUSIONS ...................................................................... 4

IV.  STATEMENT UNDER HOUSE RULE XIII, CLAUSE 3(C) .................................. 6

APPENDIX A:  REPORT OF THE INVESTIGATIVE SUBCOMMITTEE

**117TH CONGRESS, 2ND SESSION**
**U.S. HOUSE OF REPRESENTATIVES**
**COMMITTEE ON ETHICS**

**IN THE MATTER OF ALLEGATIONS RELATING TO**
**REPRESENTATIVE MADISON CAWTHORN**
_____

**December 1, 2022**
_____

Ms. WILD, from the Committee on Ethics, submitted the following

**R E P O R T**

In accordance with House Rule XI, clauses 3(a)(2) and 3(b), the Committee on Ethics (Committee) hereby submits the following Report to the House of Representatives:

## I.    INTRODUCTION

On December 1, 2022, the Committee considered the Report of the Investigative Subcommittee (ISC) in this matter, which the ISC unanimously adopted on November 16, 2022. The ISC was impaneled to investigate allegations that Representative Madison Cawthorn may have improperly promoted a cryptocurrency in which he may have had an undisclosed financial interest and engaged in an improper relationship with an individual employed on his congressional staff. This Report memorializes the Committee's conclusions based on the ISC's Report.

The Committee accepted the ISC's findings and recommendations, which were reached following a seven-month investigation.[1] The ISC did not find evidence that Representative Cawthorn engaged in an improper relationship with a member of his congressional staff and recommended no further action with respect to that allegation. The ISC found substantial evidence that Representative Cawthorn promoted a cryptocurrency in which he had a financial interest in violation of rules protecting against conflicts of interest, and that he failed to file timely reports to the House disclosing his transactions relating to the cryptocurrency. However, the ISC did not find that Representative Cawthorn knowingly or willfully failed to file timely disclosures; nonetheless, the ISC found he is required by statute to pay the applicable late filing fees for his untimely disclosures. The ISC also found that Representative Cawthorn's purchase of the cryptocurrency was on more generous terms than were available to the general public, resulting in an improper gift. The ISC unanimously recommended that Representative Cawthorn be required to repay the value of the improper gift and pay all applicable fees for his late filing of disclosures for his cryptocurrency transactions.

---

[1] The Committee thanks the Members of the ISC for their efforts and attention to this matter.

While much of the promotional activity was shared on social media by individuals other than Representative Cawthorn, the ISC recognized that he was "not a passive participant."[2]  The ISC found Representative Cawthorn made direct and unambiguous comments about purchasing or supporting a cryptocurrency in which he had invested, that he did so in contexts that he reasonably should have known would be used for public promotion, and that he also used his own social media account to share and comment on promotional posts.[3]  The ISC did not reach a consensus on whether Representative Cawthorn intended to personally profit from his promotional activities.  However, the ISC found that he should have been sensitive to the appearance of impropriety that his actions might create.  The ISC Report explains that, as a Member of the House, Representative Cawthorn has a duty to protect the integrity of that institution, and his participation in promotional efforts for the cryptocurrency he owned was inconsistent with that duty.[4]

As the ISC Report notes, Members are widely recognizable public servants, and their participation in commercial endorsements or promotions may create the perception that they are making use of their official position for commercial gain.  While cryptocurrency promotion, particularly of a "meme coin," may be a novel issue before the Committee, whether a Member may promote an asset in which that Member has a financial interest is not a novel question.  The Committee's established guidance provides that Members should not be actively involved in promoting or endorsing any goods or services in which the Member or the Member's family has a financial interest.[5]  This guidance applies to digital assets.  The Committee joins the ISC in its hope that this matter will serve to educate all Members about the laws and rules designed to protect the integrity of the House against conflicts of interest, including as they apply to digital assets.

The ISC could not come to a consensus as to whether to recommend the Committee reprove Representative Cawthorn in this matter.  However, the ISC intended that its Report serve as an admonishment of Representative Cawthorn's conduct.

Accordingly, the Committee hereby unanimously adopts the ISC's Report, which shall serve as an admonishment of Representative Cawthorn, and directs Representative Cawthorn to repay $14,237.49 to an appropriate charitable organization not later than December 31, 2022, remit late fees of $1,000 to the U.S. Department of the Treasury within fourteen days of the release of this Report, and submit a periodic transaction report (PTR) disclosing his January 17, 2022 Let's Go Brandon Coin (LGB Coin) transaction within fourteen days of the release of this Report.[6]

---

[2] ISC Report at 1.

[3] *Id*.

[4] *Id*. at 2.

[5] Comm. on Ethics, *Guidance on Personal Endorsement or Promotion by Members of the House of Representatives* (Aug. 24, 2018), https://ethics.house.gov/financial-disclosure/financial-disclosure-pink-sheets/guidance-personal-endorsement-or-promotion.

[6] Although the ISC recommended Representative Cawthorn be directed to pay $800 in late filing fees, after the ISC Report was adopted, he advised Committee staff that he incorrectly copied down the amount of LGB Coin he sold on January 17, 2022, which he initially valued at $302 and thus did not disclose in a PTR because it was below the $1,000 reporting threshold.  However, as noted in the ISC Report, the actual amount of LGB Coin sold on that date was valued well over $1,000 and should have been disclosed.  Therefore, the Committee determined Representative Cawthorn must also submit a PTR disclosing the January 17 transaction, along with an additional $200 in late fees.

Based on the totality of his conduct, including his repeated and knowing promotion of a cryptocurrency in which he held a financial interest, the Committee also determined that Representative Cawthorn acted in a manner that did not reflect creditably upon the House, in violation of clause 1 of the House Code of Official Conduct.

The ISC's Report is transmitted as an appendix to this Report.[7]

## II.   PROCEDURAL BACKGROUND

On May 23, 2022, the Committee announced that it had impaneled an ISC to investigate allegations that Representative Cawthorn may have improperly promoted a cryptocurrency in which he may have had an undisclosed financial interest and engaged in an improper relationship with an individual employed on his congressional staff.   The ISC conducted a thorough investigation, in which it interviewed seven witnesses, including Representative Cawthorn, and reviewed documents received from four individuals in response to requests for information from the ISC.  These allegations had been the subject of public reporting, as well as a class action lawsuit filed in federal court relating to an alleged "pump and dump" scheme for the cryptocurrency LGB Coin.

The ISC met six times in the 117th Congress.  The ISC sent four requests for information. Committee staff received and reviewed documents and information produced in response to the ISC's requests.   The ISC also conducted seven interviews, including an interview of Representative Cawthorn.  Representative Cawthorn and his current staffers fully cooperated with the ISC's investigation.  One individual affiliated with LGB Coin, Witness 1, provided only limited cooperation.[8]

On November 16, 2022, the ISC unanimously voted to adopt its Report and transmit it to the Committee.[9]  The ISC could not come to a consensus as to whether to recommend the Committee reprove Representative Cawthorn.  However, the ISC intended that its Report serve as an admonishment of Representative Cawthorn's conduct.  The Committee considered the ISC's Report and on December 1, 2022, unanimously voted to release the ISC's findings and issue this Report.

---

[7] *See* Appendix A.
[8] ISC Report at 2.
[9] *Id*. at 3.

### III.     FINDINGS AND CONCLUSIONS

**A.     Allegations that Representative Cawthorn May Have Engaged in an Improper Relationship with an Individual Employed on his Congressional Staff**

In the spring of 2022, there was public discussion in news articles and on social media relating to Representative Cawthorn's personal relationship with a member of his congressional staff, following the release of photographs and videos depicting the two of them engaging in explicit and sexually suggestive comments and conduct.  Both denied having any romantic or sexual relationship.  All witnesses interviewed by the ISC also stated there was no improper relationship between the two, and that the close relationship between Representative Cawthorn and this individual did not create an unfair work environment.  Furthermore, the ISC established that any depictions of sexually-themed or otherwise inappropriate comments or conduct took place prior to Representative Cawthorn's service in the House and beyond the ISC's jurisdiction.

The ISC reviewed Representative Cawthorn's conduct and found no evidence of an improper relationship between Representative Cawthorn and a member of his congressional staff.  The ISC also found no evidence of an unprofessional office environment, and found that Representative Cawthorn did not violate House Rules or laws relating to nepotism, as the staffer was not a first cousin.  The Committee accepts the ISC's findings and recommendation with respect to this allegation.

**B.     Allegations Relating to Representative Cawthorn's Financial Interest in LGB Coin**

Representative Cawthorn received 180 billion LGB Coin on December 21, 2021, for which he provided a $150,000 check to Witness 1, based on an over two-week-old valuation of LGB Coin.  The transaction occurred just before LGB Coin announced that it would sponsor NASCAR driver Brandon Brown in the 2022 season.  The sponsorship was made public on December 30, 2021; however, NASCAR withdrew its approval on January 4, 2022.  Representative Cawthorn sold nearly all of his LGB Coin in three batches on December 31, 2021, January 4, 2022, and January 17, 2022.[10]

Representative Cawthorn did not disclose either his purchase or sales of his LGB Coin until after the Committee established the ISC.  Additionally, Representative Cawthorn was seen in multiple photographs and videos in which he appeared to support or specifically encouraged individuals to purchase LGB Coin, including after the value of the LGB Coin that he held plummeted.

The ISC found that Representative Cawthorn improperly promoted a cryptocurrency in which he had a financial interest, in violation of conflicts of interest rules set forth in House Rule XXIII, clause 3 and paragraph 5 of the Code of Ethics for Government Service.  However, the ISC

---

[10] Representative Cawthorn still owns 15,378,707,329 LGB Coin, which he believed was valued at approximately $357.52 as of November 19, 2022.  However, as noted in the ISC Report, the value of his remaining LGB Coin was substantially less at the time the Report was adopted, and it is unclear how Representative Cawthorn reached his estimation of the value.

did not reach a consensus on whether Representative Cawthorn intended to personally profit from his promotional activities. The ISC found he also violated the Ethics in Government Act by failing to timely disclose his financial investment in LGB Coin pursuant to House disclosure requirements; however, the ISC did not find his failure to be knowing or willful. The ISC found Representative Cawthorn was misinformed regarding the requirements related to cryptocurrency disclosures, which are relatively new.[11] Finally, the ISC found Representative Cawthorn received an improper gift under House Rule XXV, clause 5, when he purchased LGB Coin on terms more favorable than those available to the general public. The ISC recommended that Representative Cawthorn be directed to pay the applicable late filing fees for his late disclosure, and to repay $14,237.49, reflecting the approximate value of the gift he received, to an appropriate charitable organization.

The ISC also considered allegations that Representative Cawthorn may have been involved in fraudulent activities relating to the cryptocurrency, including allegations of insider trading and/or a scheme to artificially inflate the value of LGB Coin. While the ISC questioned Representative Cawthorn's explanations for his trading activities, the ISC did not find sufficient evidence of fraudulent activity.

The ISC could not come to a consensus as to whether to recommend the Committee reprove Representative Cawthorn, but intended for its Report to serve as an admonishment of Representative Cawthorn's conduct.

The Committee accepts the ISC's findings relating to Representative Cawthorn's LGB Coin activity. The Committee, accordingly, voted unanimously to adopt the Report of the ISC and includes that Report as part of the Committee's Report to the House of Representatives on this matter. Representative Cawthorn is directed to pay $14,237.49 to an appropriate charitable organization by December 31, 2022, to pay $1,000 in late filing fees to the U.S. Department of the Treasury within 14 days of the release of this Report, and to file a PTR disclosing his January 17, 2022 LGB Coin transaction within fourteen days of the release of this Report.

The Committee also determined that Representative Cawthorn's conduct with respect to LGB Coin did not reflect creditably upon the House, in violation of clause 1 of the Code of Conduct. Clause 1 is a purposely subjective standard designed to "have a deterrent effect against improper conduct," and provide "the ability to deal with any given act or accumulation of acts which, in the judgment of the Committee, are severe enough to reflect discredit on the Congress."[12][13] The provision serves "as a safeguard for the House as a whole."[13]

Following the publication of this Report, repayment of the value of the improper gift, payment of all applicable late fees for untimely filings of House disclosures, and filing a disclosure

---

[11] ISC Report at 21-22 (noting that Representative Cawthorn reasonably relied on the advice of his accountant, who erroneously informed him cryptocurrency transactions did not need to be disclosed on Periodic Transaction Reports).

[12] *House Ethics Manual* at 13 (2008) (citing 114 Cong. Rec. 8778 (Apr. 3, 1968)).

[13] House Comm. on Standards of Official Conduct, *Inquiry into the Operation of the Bank of the Sergeant-At-Arms of the House of Representatives*, H. Rept. 102-452, 102d Cong. 2d Sess. 22 (March 10, 1992) (citing H. Rept. 90-1176, 90th Cong. 2d Sess. 17 (1968)).

regarding his January 17, 2022 LGB Coin transaction, the Committee will consider this matter closed.

#### IV.     STATEMENT UNDER HOUSE RULE XIII, CLAUSE 3(C)

The Committee made no special oversight findings in this Report.  No budget statement is submitted.  No funding is authorized by any measure in this Report.

# APPENDIX A
# to
# Committee Report

**ADOPTED BY THE INVESTIGATIVE SUBCOMMITTEE
ON NOVEMBER 16, 2022**

**117TH CONGRESS, 2ND SESSION
U.S. HOUSE OF REPRESENTATIVES
COMMITTEE ON ETHICS**

**IN THE MATTER OF ALLEGATIONS RELATING TO
REPRESENTATIVE MADISON CAWTHORN**

**November 16, 2022**

Ms. ESCOBAR, from the Investigative Subcommittee, submitted the following

**REPORT**

To the Committee on Ethics

**INVESTIGATIVE SUBCOMMITEE**

Veronica Escobar, Texas
*Chairwoman*

Michael Guest, Mississippi
*Ranking Member*

Lisa Blunt Rochester, Delaware

Michelle Fischbach, Minnesota

**REPORT STAFF**

Thomas A. Rust, *Chief Counsel/Staff Director*
Brittney Pescatore, *Director of Investigations*

Sydney R. Bellwoar, *Counsel*
Janet M. Foster, *Senior Counsel*
Caroline Taylor, *Investigator*
Peyton Wilmer, *Investigative Clerk*

# C O N T E N T S

_____

I.   INTRODUCTION ...................................................................................................... 1

II.  PROCEDURAL HISTORY ........................................................................................ 2

III. FINDINGS .................................................................................................................. 3

    A.   ALLEGATIONS THAT REPRESENTATIVE CAWTHORN MAY HAVE ENGAGED IN AN IMPROPER

    RELATIONSHIP WITH AN INDIVIDUAL EMPLOYED ON HIS CONGRESSIONAL STAFF. .................. 3

        1.   *Background* .................................................................................................... 3

        2.   *Relevant Laws, Rules, and Other Applicable Standards of Conduct* ........... 5

        3.   *Analysis* ....................................................................................................... 6

    B.   ALLEGATIONS RELATING TO REPRESENTATIVE CAWTHORN'S FINANCIAL INTEREST IN LET'S GO

    BRANDON COIN ...................................................................................................... 6

        1.   *Background* .................................................................................................... 6

        2.   *Relevant Laws, Rules, and Other Applicable Standards of Conduct* ......... 16

        3.   *Analysis* ..................................................................................................... 18

IV.  RECOMMENDATION ............................................................................................ 22

APPENDIX A:  Exhibits to the Report of the Investigative Subcommittee

**117TH CONGRESS, 2ND SESSION**
**U.S. HOUSE OF REPRESENTATIVES**
**COMMITTEE ON ETHICS**

**IN THE MATTER OF ALLEGATIONS RELATING TO**
**REPRESENTATIVE MADISON CAWTHORN**
_____

**November 16, 2022**
_____

**REPORT OF THE INVESTIGATIVE SUBCOMMITTEE**

## I.       INTRODUCTION

On May 23, 2022, the Committee on Ethics (Committee) impaneled this Investigative Subcommittee (ISC) to investigate whether Representative Madison Cawthorn may have improperly promoted a cryptocurrency in which he may have had an undisclosed financial interest and engaged in an improper relationship with an individual employed on his congressional staff.

The ISC conducted a detailed investigation into the allegations.  The ISC did not find evidence that Representative Cawthorn engaged in an improper relationship with a member of his congressional staff and recommends that the full Committee take no further action with respect to that allegation.

The ISC found substantial evidence that Representative Cawthorn promoted a cryptocurrency in which he had a financial interest in violation of rules protecting against conflicts of interest.  Representative Cawthorn also failed to file timely reports to the House disclosing his transactions relating to the cryptocurrency.  However, the ISC did not find that Representative Cawthorn knowingly or willfully failed to file timely disclosures; Representative Cawthorn nonetheless is required by statute to pay the applicable late filing fees for his untimely disclosures.  The ISC also found that Representative Cawthorn's purchase of the cryptocurrency was on more generous terms than were available to the general public, resulting in an improper gift.

Although much of the promotional activity was shared on social media by individuals other than Representative Cawthorn, he was not a passive participant.  He made direct and unambiguous comments about purchasing or supporting a cryptocurrency in which he had invested, and did so in contexts that he reasonably should have known would be used for public promotion.  He also used his own social media account to share and comment on promotional posts.  Even if it was not Representative Cawthorn's intent to personally profit, Representative Cawthorn should have been sensitive to the appearance of impropriety that his actions might create.

Additionally, the ISC reminds all Members, that, as widely recognizable public servants, their participation in commercial endorsements or promotions may create the perception that they are making use of their official position for commercial gain.  The Committee's established

guidance provides that Members should not be actively involved in promoting or endorsing goods or services in which the Member or the Member's family has a financial interest.  This guidance applies to digital assets.

The ISC also considered allegations that Representative Cawthorn may have been involved in fraudulent activities relating to the cryptocurrency, including allegations of insider trading and/or a scheme to artificially inflate the value of the asset.  The ISC did not find substantial evidence of Representative Cawthorn's involvement in any such activities.  However, the ISC questioned Representative Cawthorn's explanations for his trading activity.  These questions in part led to a lack of consensus regarding whether Representative Cawthorn intended to profit from his promotion of LGB Coin.  Nonetheless, as a Member of the House, Representative Cawthorn has a duty to protect the integrity of that institution; his participation in promotional efforts for the cryptocurrency he owned was inconsistent with that duty.

The ISC could not come to a consensus as to whether to recommend the Committee reprove Representative Cawthorn.  However, it is the ISC's intention that this Report serve as an admonishment of Representative Cawthorn's conduct.

The ISC, by this Report, unanimously recommends that the full Committee direct Representative Cawthorn to repay the value of the improper gift and pay all applicable fees for his late filing of disclosures for his cryptocurrency transactions, and that the Committee adopt this Report to serve as an admonishment of Representative Cawthorn.

## II.   PROCEDURAL HISTORY

On May 23, 2022, the Committee announced it had unanimously voted to impanel an ISC with jurisdiction to determine whether Representative Cawthorn may have: (1) improperly promoted a cryptocurrency in which he may have had an undisclosed financial interest, and (2) engaged in an improper relationship with an individual employed on his congressional staff.  The allegations had been the subject of public reporting, as well as a class action lawsuit filed in federal court relating to an alleged "pump and dump" scheme for a cryptocurrency, Let's Go Brandon Coin (LGB Coin).[1]

The ISC met six times in the 117th Congress.  The ISC sent four requests for information. Committee staff received and reviewed documents and information produced in response to the ISC's requests.   The ISC also conducted seven interviews, including an interview of Representative Cawthorn.  Representative Cawthorn and his current staffers fully cooperated with the Committee's investigation.  One individual affiliated with LGB Coin, Witness 1, provided only limited cooperation.[2]

---

[1] *Ford v. Koutoulas et al.*, 6:22-cv-652-PGB-DCI (M.D. Fl. filed Apr. 1, 2022).

[2] The ISC issued written questions to Witness 1 after his counsel informed the ISC, one day before a scheduled interview, that Witness 1 was unwilling to voluntarily participate in an interview due to the use of House reporters, which is standard Committee practice.  Witness 1 conveyed, through counsel, that he was particularly concerned that a recorded transcript could be provided to other federal agencies.  E-mail from Witness 1's counsel, Mark Ruddy, to Committee staff, Committee on Ethics (Sept. 7, 2022, 03:45 EST) ("I just wanted to reaffirm the position we took earlier and to get back to you as promised.  In short, my client is not appearing tomorrow.");  E-mail from Witness

On November 16, 2022, the ISC unanimously voted to adopt and transmit this Report to the Committee.

## III.   FINDINGS

Representative Cawthorn has been a Member of the House of Representatives since 2021, representing North Carolina's 11th congressional district.  The ISC reviewed allegations relating to Representative Cawthorn's relationship with an individual employed on his congressional staff (Current Staffer 4), and Representative Cawthorn's interest in a cryptocurrency, LGB Coin.  The ISC's findings are discussed below.

### A.   Allegations that Representative Cawthorn May Have Engaged in an Improper Relationship with an Individual Employed on his Congressional Staff

#### 1.   Background

On January 2, 2020, Representative Cawthorn's principal campaign committee, Cawthorn for NC, filed a Statement of Organization with the Federal Election Commission for the 2020 election.[3]  Among those on his campaign staff was Current Staffer 4, who began receiving a salary from the campaign almost immediately.[4]

Representative Cawthorn won the general election on November 3, 2020.  Shortly thereafter, Representative Cawthorn vacationed in Mexico with his then-fiancée, as well as Current Staffer 4 and other friends and campaign staff.  Following Representative Cawthorn's swearing in on January 3, 2021, Current Staffer 4 was hired as a scheduler in Representative Cawthorn's congressional office.  In August 2021, Current Staffer 4 was moved to the Chief Administrative Office payroll as aide for the congressman pursuant to the Americans with Disabilities Act (ADA).

In the spring of 2022, there was public discussion in news articles and on social media relating to Representative Cawthorn's personal relationship with Current Staffer 4, following the release of photographs and videos depicting the two of them engaging in explicit and sexually suggestive comments and conduct.[5]  Representative Cawthorn and Current Staffer 4 each released statements on social media, responding to the press releases.  Representative Cawthorn described one of the videos as "just stupid locker room talk between two cousins that grew up like brothers, taken long before I served in Congress."[6]  Current Staffer 4 stated that he and the congressman

---

1's counsel, Mark Ruddy, to Committee staff, Committee on Ethics (Sept. 7, 2022, 09:59 EST) ("We never agreed and take issue with their [sic] being a House reporter."); *see also* Letter from Witness 1's counsel, Mark Ruddy, to Committee staff, Committee on Ethics (Sept. 16, 2022) (hereinafter *Witness 1's Response to ISC*) ("We ask to be apprised in writing if the Committee makes a referral of this matter to any government agency where [Witness 1] may be a target of any contemplated enforcement action, whether it be civil, criminal, administrative or otherwise.").
[3] *See* Cawthorn for NC, Statement of Organization (Jan. 2, 2020).
[4] *See* Cawthorn for NC, 2020 Pre-Primary Report of Receipts and Disbursements at 43 (Dec. 20, 2019).
[5] *See, e.g.*, Michael Kruse, *'He's Not OK': The Entirely Predictable Unraveling of Madison Cawthorn,* POLITICO (May 13, 2022), https://www.politico.com/news/magazine/2022/05/13/madison-cawthorn-injury-profile-00032002.
[6] Madison Cawthorn (@CawthornforNC), TWITTER (May 4, 2022, 04:12 PM), https://twitter.com/CawthornforNC/status/1521945888050003975.

"are second cousins and have been best friends years before we were involved in politics," that a video circulating in the media "was years ago," and that he and Representative Cawthorn "were clearly just cutting up and being stupid kids."[7]

The ISC's investigation established that any depictions of sexually-themed or otherwise inappropriate comments or conduct took place prior to Representative Cawthorn's service in the House.

Representative Cawthorn and Current Staffer 4 denied having any romantic or sexual relationship, and all staffers interviewed stated that at no point did they understand there to be a romantic or sexual relationship between the two.[8]  Current Staffer 4 is related to Representative Cawthorn; they understand each other to be second or third cousins,[9] and view each other as akin to brothers.[10]  Current Staffer 4 considers the Congressman to have "been one of [his] best friends for years now."[11]  These feelings of brotherly affection were corroborated by the testimony of six current and former staffers.  For example, Former Staffer 1 stated Representative Cawthorn and Current Staffer 4 are "like brothers,"[12] and Current Staffer 2 said "[t]hey were very close.  I believe they have described it as brotherly, and I wouldn't cast doubt on that description."[13]  Likewise, Former Staffer 2 stated, "I would describe [their relationship] as brothers.  Just as an outsider looking in, they're as close as brothers.  They treat each other like brothers."[14]

Representative Cawthorn had a close social relationship with several of his staffers, most of whom he had a friendship with prior to his time in Congress.  Current Staffer 4 was in Representative Cawthorn's wedding party, and at least two other staffers attended his wedding and/or bachelor party during the time that they were employed in his office.[15]  None of the staffers interviewed by the ISC indicated that they viewed Representative Cawthorn's close relationship with Current Staffer 4 or any other staffers to create an unfair work environment.[16]  All staffers interviewed by the ISC stated that Representative Cawthorn was professional in his interactions

---

[7] Current Staffer 4, FACEBOOK (May 6, 2022),
https://www.facebook.com/100025621670038/posts/pfbid024EzGBTJaBZuiewh8G1KZwCQp1easDTBLezcbfBU1
GcnhpgHRLJZb3NFWpyhfaNyEl/?d=n__;!!Bg5easoyC-OII2vlEqY8mTBrtW-
N4OJKAQ!YEWsWuo2qMSRNr_ToU4fooN3J0LnR8_8sQ-Rd8uvRzHv-OaIDx9uYvH2kz_Cj4LbpKtv6Cj7Qgw$.
[8] ISC Interview of Representative Cawthorn; ISC Interview of Current Staffer 4; *see also* ISC Interview of Current Staffer 1; ISC Interview of Current Staffer 2; ISC Interview of Former Staffer 1; and ISC Interview of Former Staffer 2.
[9] ISC Interview of Representative Cawthorn ("[E]ither second or third cousin[s]."); ISC Interview of Current Staffer 4 ("I believe we're second cousin[s] once removed.  Our fathers are first cousins.").  Based on the familial relationship described by Current Staffer 4, the ISC understands them to be second cousins.  *Cousin Chart*, State Library of North Carolina (last visited Oct. 26, 2022), https://statelibrary.ncdcr.gov/research/genealogy-and-family-history/family-records/cousin-chart.
[10] ISC Interview of Representative Cawthorn ("I genuinely believe of him as like my little brother.").
[11] ISC Interview of Current Staffer 4.
[12] ISC Interview of Former Staffer 1.
[13] ISC Interview of Current Staffer 2.
[14] ISC Interview of Former Staffer 2.  *See also* ISC Interview of Current Staffer 3.
[15] ISC Interview of Current Staffer 1; ISC Interview of Current Staffer 2; ISC Interview of Current Staffer 4.
[16] ISC Interview of Current Staffer 2; ISC Interview of Current Staffer 3; ISC Interview of Former Staffer 1; ISC Interview of Former Staffer 2.

with Current Staffer 4 in the office.[17]   In Current Staffer 4's annual review, he was given both positive and critical feedback by senior staff.[18]   Current Staffer 4 did not discuss his salary with Representative Cawthorn and did not negotiate his starting salary.[19]   He did not receive higher pay than any other staffers with commensurate positions, nor did he receive a higher bonus than other staffers.[20]

## 2.   Relevant Laws, Rules, and Other Applicable Standards of Conduct

The Congressional Accountability Act incorporates Title VII, which makes it unlawful to sexually harass employees or otherwise discriminate against employees in violation of federal employment laws, including the creation of a hostile work environment.

A federal nepotism law, 5 U.S.C. § 3110, generally prohibits a federal official, including a Member of Congress, from appointing, promoting, or recommending for appointment or promotion any "relative" of the official to any agency or department over which the official exercises authority or control.   A "relative" is defined to include only the following familiar connections: "father, mother, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, husband, wife, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, or half sister."[21]

House Rule XXIII, the Code of Official Conduct, states in clause 1 that Members shall act at all times in a manner that reflects creditably upon the House.   The Committee has found clause 1 violations in other matters involving allegations of workplace and/or sexual misconduct.   Clause 2 states that Members must "adhere to the spirit and the letter of the Rules of the House."   Clause 8(c)(1)(A), which states that a Member may not retain a relative in a paid position, defines relative to include *first cousin*, but not more distant cousins.   Clause 9 prohibits acts of discrimination or harassment on the basis of a protected class in the congressional workplace.   The Committee has found that workplace misconduct may violate the "spirit" of this provision even where it does not explicitly constitute legal harassment or discrimination.[22]   Clause 18(a) states that Members "may

---

[17] ISC Interview of Current Staffer 1; ISC Interview of Current Staffer 2; ISC Interview of Current Staffer 3; ISC Interview of Former Staffer 1; ISC Interview of Former Staffer 2.

[18] For example, although it was a "pretty glowing" performance evaluation, Representative Cawthorn and Current Staffer 1 wanted Current Staffer 4 to "write things down more" because he would forget some assignments. ISC Interview of Current Staffer 1.  Current Staffer 1 was also responsible for writing Current Staffer 4's performance evaluation. ISC Interview of Current Staffer 1.

[19] ISC Interview of Current Staffer 4.

[20] *See, e.g.*, First Quarter 2021 House Statement of Disbursements from Office of Representative Cawthorn.  Current Staffer 1 used performance evaluations to determine bonuses for all staffers.  ISC Interview of Current Staffer 1.

[21] 5 U.S.C. § 3110(a)(3).

[22] Comm. on Ethics, *In the Matter of Allegations Relating to Representative Mark Meadows*, H. Rept. 115-1042, 115th Cong. 2d Sess. (2018); Comm. on Ethics, *In the Matter of Allegations Relating to Representative Alcee L. Hastings*, H. Rept. 113-663, 113th Cong. 2d Sess. (2014) (finding that, while the Member's comments, including that he had "difficulty sleeping after sex" and "could not understand how . . . female Members … can stay in their own clothing, specifically their underwear, for 16 hours at a time" did not support a claim of sexual harassment, they were nonetheless "less than professional and "show[ed] poor judgment."); Comm. on Standards of Official Conduct, *In the Matter of Representative Jim Bates*, H. Rept. 101-293, 101st Cong. 1st Sess. (1989) (finding the Member violated House Rule XXIII, cl. 9 by sexually harassing two female staffers, including straddling a staffer's leg,

not engage in a sexual relationship with any employee of the House who works under the supervision of the Member."

### 3. Analysis

After extensive investigation, the ISC found no evidence of an improper relationship between Representative Cawthorn and Current Staffer 4 during the time that Current Staffer 4 has been employed in Representative Cawthorn's congressional office.  While some photographs and videos published in the media were indicative of improper conduct if by a Member of Congress with a staffer, the ISC determined during its review that the vast majority of videos and photographs depicting potentially intimate, sexual, or crass comments or conduct involving Representative Cawthorn and Current Staffer 4, were from prior to Representative Cawthorn's election to Congress and beyond the ISC's jurisdiction.  With respect to the few images posted after Representative Cawthorn's election showing Representative Cawthorn and Current Staffer 4 acting in a familiar manner, the ISC felt that they did not themselves indicate an improper relationship.  Furthermore, given the consistency of statements made by multiple witnesses, the ISC did not find reason to believe that Representative Cawthorn's relationship was, at any time, anything other than what he described.

The ISC also found no evidence of an unprofessional office environment.  The Committee has previously reviewed matters where the Member's relationship with staff "crossed the line from close working relationship to overly-familiar," leading to an unprofessional working environment.[23]  The ISC found that not to be the case here.  Both current and former staffers consistently testified that Representative Cawthorn was professional and that his close friendship with Current Staffer 4 did not impact the office environment.  This is further reinforced by the fact that Current Staffer 1 was mainly responsible for setting Current Staffer 4's salary and bonus and conducting his performance review.

Representative Cawthorn also did not violate House Rules or laws relating to nepotism because the rule does not apply to cousins more distant than first cousins.  As Current Staffer 4 is not a first cousin of Representative Cawthorn, there is nothing improper in employing Current Staffer 4 as scheduler and ADA aide.

### B. Allegations Relating to Representative Cawthorn's Financial Interest in LGB Coin

### 1. Background

The phrase "Let's Go Brandon" arose from a NASCAR event on October 2, 2021, where a reporter speaking to driver Brandon Brown misheard the crowd's chant; it has become a phrase used to express criticism of President Joe Biden.  A cryptocurrency called Let's Go Brandon, or

---

touching a staffer's knees, shoulders and buttocks, and making comments of a sexual nature, and reproving him for his conduct).

[23] Comm. on Ethics, *In the Matter of Allegations Relating to Representative Thomas Garrett*, Staff Rept. 115th Cong. 2d Sess. 37 (2019).

LGB Coin,[24] was created in or around early November 2021.[25]  Witness 1 was involved with the coin early on,[26] serving as the public face of the coin and one of its largest holders.

As early as November 2021, NASCAR and LGB Coin had been in negotiations regarding LGB Coin's sponsorship of Brandon Brown for the upcoming racing season.[27]  On December 26, 2021, a NASCAR official indicated in an email that the sponsorship was approved,[28] and the sponsorship was publicly announced on December 30, 2021, leading to a significant increase in the value of LGB Coin.  NASCAR later announced that it would not approve the sponsorship, and that the NASCAR employee who had sent the December 26, 2021, email was not authorized to provide approval.[29]  After NASCAR officially withdrew approval of the sponsorship, the value of LGB Coin plummeted.  In February 2022, the coin was "re-launched," with the new "LETSGO" coin deposited into the cryptocurrency wallets of existing LGB Coin holders.[30]  However, neither the original LGB Coin or the rebranded LETSGO coin recovered any significant value.

In April 2022, a class action complaint was filed in federal district court against Witness 1, NASCAR, and other parties, alleging that LGB Coin was used for a "pump and dump" scheme, by which Witness 1 and others collaborated with "several celebrity promotors" to misleadingly promote LGB Coin, leading to an artificial increase in the value of the coin, at which time "insiders" sold off their coin at a profit.[31]  Representative Cawthorn has not been named as a defendant in the lawsuit, which is ongoing, but the complaint (and subsequent amended complaints) cited Instagram posts in which he appeared and alleged that the defendants "used [Representative] Cawthorn to promote the LGBCoin at [an event] and investors following the event through social media."[32]  Following public reporting about Representative Cawthorn's involvement with LGB Coin, he filed overdue Periodic Transaction Reports disclosing his

---

[24] This Report uses LGB Coin to refer to the decentralized meme cryptocurrency minted or launched as $LGB and/or $LETSGO, as well as any affiliated entities, organizations, or projects, including but not limited to LGBcoin.io and LGBcoin.io Foundation.

[25] LGB Coin is a "meme coin," which have little or no inherent value.  *See* Jeffrey Carter, *Companion Post on LGB Coins*, POINTS AND FIGURES (Nov. 1, 2021), https://jeffreycarter.substack.com/p/companion-post-on-lgb-coins.  For additional information about meme coins, *see* Dan Ashmore, *What Are Meme Coins? Are They Worth Investing In?*, FORBES (Aug. 4, 2022), https://www.forbes.com/advisor/investing/cryptocurrency/what-are-meme-coins-are-they-worth-investing-in.

[26] *See, e.g.,* Jeffrey Carter, *Congratulations to an Unsung American Hero*, POINTS AND FIGURES (Nov. 1, 2021), https://jeffreycarter.substack.com/p/congratulations-to-an-unsung-american?utm_source=profile&utm_medium=reader2.

[27] Witness 1's Response to ISC.

[28] Exhibit 1.

[29] *See* Liz Clarke, *NASCAR Rejects Sponsorship Deal Based on 'Let's Go Brandon' Chant*, THE WASHINGTON POST (Jan. 4, 2022), https://www.washingtonpost.com/sports/2022/01/04/lgbcoin-lets-go-brandon-nascar-rejected/.

[30] *'LetsGoBrandon' Foundation Re-launches Crypto Coin with Improved Tokenomics; Installs Veteran Executive Management; Brandonbilt Motorsports Consolidates IP*, SPEEDWAY DIGEST (Feb. 13, 2022), https://www.speedwaydigest.com/index.php/news/67030-letsgobrandon-foundation-re-launches-crypto-coin-with-improved-tokenomics-installs-veteran-executive-management-brandonbilt-motorsports-consolidates-ip; Matt Stieb, *Madison Cawthorn's Crypto Guru Goes Bust in the Hyperworld of Miami's Crypto Right, the "Let's Go Brandon" Coin Sounded as Good as Gold*, NEW YORK MAGAZINE (May 12, 2022), https://nymag.com/intelligencer/2022/05/lets-go-brandon-coins-james-koutoulas-on-madison-cawthorn.html.

[31] *See Ford v. Koutoulas et al.*, 6:22-cv-652-PGB-DCI (M.D. Fl. filed Apr. 1, 2022).

[32] Second Amended Complaint at 40-43, Ford v. Koutoulas et al, 6:22-cv-652-PGB-DCI (M.D. Fl. filed July 19, 2022) (hereinafter *Second Amended Complaint*).

purchase and sales of LGB Coin.  Representative Cawthorn's history of involvement with LGB Coin and disclosure of such is discussed in more detail below.

<em>a)   Representative Cawthorn's LGB Coin Purchase, Sales, and Promotions</em>

On or around December 3, 2021, Representative Cawthorn met Witness 1.  Witness 1 recalled that this meeting occurred at a Christmas party fundraiser hosted by former President Donald Trump.[33]  Representative Cawthorn recalled seeing Witness 1 on "social occasions," which he described as "fundraising events throughout the country."[34]  His recollection, however, was that he first met Witness 1 backstage at a conference where Witness 1 had been presenting.[35] Witness 1 told the ISC, through his counsel, that he did not discuss LGB Coin with Representative Cawthorn at the Christmas party, but did discuss "support of the Coin" with Representative Cawthorn at Mar-a-Lago the following day.[36]  Representative Cawthorn told the ISC that he had heard of LGB Coin prior to meeting Witness 1, and planned to purchase it.[37]

The day after the Christmas party, Witness 1 posted a photograph on Instagram of himself and Representative Cawthorn at the event, in which Representative Cawthorn is holding an LGB Coin pin.[38]  Representative Cawthorn told the ISC that he had no issues holding up the pin, as it is normal for people at events to ask him to pose for pictures, and "often times [I] will hold things people ask me to."[39]  He explained, "normally I just kind of look at the front of [the object] and make sure there's no overt symbol I completely disagreed with or something."[40]

Following their initial meeting, Witness 1 and Representative Cawthorn had text communications discussing Representative Cawthorn's intended purchase of LGB Coin.  On December 5, Witness 1 sent a text to Representative Cawthorn stating, without further context, "Btw confirmed 100k at 275M market cap."[41]  Representative Cawthorn testified that Witness 1

---

[33] Witness 1's Response to ISC ("[Witness 1] informally met Congressman Cawthorn at former President Donald Trump's Christmas party on December 3, 2021"); *see also* Matt Stieb, *Madison Cawthorn's Crypto Guru Goes Bust in the Hyperworld of Miami's Crypto Right, the "Let's Go Brandon" Coin Sounded as Good as Gold*, NEW YORK MAGAZINE (May 12, 2022), https://nymag.com/intelligencer/2022/05/lets-go-brandon-coins-james-koutoulas-on-madison-cawthorn.html (reporting that Witness 1 met Representative Cawthorn at a Christmas party fundraiser hosted by former President Trump in Naples, FL).

[34] ISC Interview of Representative Cawthorn.

[35] *Id.*

[36] Witness 1's Response to ISC.

[37] ISC Interview of Representative Cawthorn.

[38] Exhibit 2.

[39] ISC Interview of Representative Cawthorn.

[40] *Id.*

[41] Exhibit 3.  Witness 1 denied having any discussions about Representative Cawthorn's potential LGB Coin purchase, or having knowledge of Representative Cawthorn's purchase until Representative Cawthorn texted him on December 21, 2021.  Witness 1's Response to ISC.  Witness 1 also informed the ISC that "Congressman Cawthorn mentioned to [Witness 1] that he purchased the Coin in early December 2021 at the current market price."  *Id.* However, these texts directly contradict Witness 1's assertions, as does a CoinDesk article in which Witness 1 stated he told Representative Cawthorn about LGB Coin at the December 3 event and that Representative Cawthorn gave him a check for $150,000 to purchase LGB Coin.  *See* Danny Nelson, *Inside Madison Cawthorn's $150K Crypto Bet: Here's the Wallet Under Ethics Investigation,* COINDESK (June 1, 2022),

8

was "just following up on something we discussed," and recalled that he indicated to Witness 1 that he wanted to invest in LGB Coin.[42]  The next day, December 6, Representative Cawthorn replied, "Actually I can't take the discounted Market Cap.  Could you please quote me the full market cap at the time of agreement?"[43]  Representative Cawthorn did not accept the discounted market capitalization because he felt "it's improper as a Member of Congress to try and accept some kind of a discount."[44]  Witness 1 said, "Ah too bad.  Yessir [the market cap will be] 313M."[45]  Based on LGB Coin's historic trading value, that would likely place the "time of agreement" as December 3, 2022.[46]  Representative Cawthorn then confirmed that he would purchase $150,000 worth of LGB Coin, rather than $100,000.[47]  According to Representative Cawthorn, the additional $50,000 was a result of "look[ing] into how much money do I have currently in [my] money market that I can then instantly transfer to buy this."[48]

Also on December 6, Witness 1 posted an Instagram story that showed a photograph of himself with Representative Cawthorn and others, with the header "LGB meeting."[49]  This photograph was taken at a gala hosted at Mar-a-Lago in the days following the December 3 Christmas party.  Representative Cawthorn denied that this was a meeting regarding LGB Coin, but he could not recall if LGB Coin was discussed among the individuals depicted.[50]

On or around December 20, Representative Cawthorn gave Witness 1 a check for $150,000.[51]  Representative Cawthorn received 180 billion LGB Coin to his Coinbase wallet on December 21, from an unidentified source.[52]  However, the actual value of the 180 billion LGB Coin on December 21 was more than what Representative Cawthorn paid based on the trading value—the value for that amount of LGB Coin fluctuated between $156,154.75 and $172,320.23, with an average trading value of approximately $164,237.49.  According to Representative Cawthorn, he bought LGB Coin to connect with his generation, poke fun at a political opponent, and address the government's control of currency.[53]  Additionally, he told the ISC that he

---

https://www.coindesk.com/policy/2022/06/01/cawthorns-crypto-wallet-reveals-undisclosed-trades-amid-house-ethics-investigation.  Representative Cawthorn sent Witness 1 his cryptocurrency wallet address on December 15 and gave Witness 1 a check on or around December 20, 2021; Representative Cawthorn understood that the LGB Coin he received in exchange for this check were transferred to his wallet by Witness 1. ISC Interview of Representative Cawthorn; Exhibit 3; Exhibit 5.

[42] ISC Interview of Representative Cawthorn.
[43] Exhibit 3.
[44] ISC Interview of Representative Cawthorn.
[45] Exhibit 3.
[46] The trading high on December 3, 2022 was 0.000000951257, with a market capitalization equivalent to approximately $313,914,810.
[47] Exhibit 3.
[48] ISC Interview of Representative Cawthorn.
[49] Exhibit 6.
[50] ISC Interview of Representative Cawthorn.
[51] Id.; Exhibit 5.  The check was dated, however, for December 24, 2021, and does not appear to have been deposited until December 31, 2021.
[52] Exhibit 7.  Coinbase is a centralized cryptocurrency exchange platform.  A Coinbase wallet allows storage of digital assets and private keys on a device, such as a cell phone, rather than on the exchange.  Some currencies, like LGB Coin, cannot be traded on the Coinbase exchange directly from a Coinbase wallet and must be first transferred to a Coinbase account.  A Coinbase account acts as a centralized server to store cryptocurrency on the Coinbase exchange.
[53] ISC Interview of Representative Cawthorn.

understood that LGB Coin was a "meme coin," that meme coins are "not ever a good investment for people," and that he did not expect to earn money from this investment.[54]

After receiving the LGB Coin on December 21, 2021, Representative Cawthorn texted Witness 1, "Excited to announce I bought some LGB" and that they should "pump this up so much."[55]  Representative Cawthorn told the ISC that he meant to "publicly tell people" he bought LGB Coin when he sent this text.[56]  Witness 1 responded to Representative Cawthorn's text stating, "Welcome Aboard Patriot!" and then the next day, December 22, asked, "You want me to post that you aped in or you wanna do it?"[57]  Representative Cawthorn did not respond to this text. That same day, Representative Cawthorn posted a story to his Instagram account that was originally a story posted by another LGB Coin promoter.[58]  The original post stated, "Huge announcements coming soon!!!" and "Im [sic] on this train!" and included a link to LGB Coin's website where individuals could purchase the cryptocurrency.[59]  Later on December 22, Witness 1 sent another text, "Btw check your wallet we [sic] having a nice rally."[60]  Representative Cawthorn replied, "WOW!!!!!!  That's amazing."[61]

On December 29, Representative Cawthorn was tagged in an Instagram story posted by Witness 1, which said "12/30/2021" and Brandon Brown's number, 68, inlaid behind it, as well as the number 68 and Mr. Brown's signature at the bottom of the post.[62]  In private Instagram messages between the two, Representative Cawthorn replied "Ooooooooo" and Witness 1 said, "Kekeke,"[63] as a way to "express excitement through the use of internet slang."[64]  Later on December 29, Witness 1 posted a photograph to Instagram with himself, Representative Cawthorn, and others, taken at a fundraising event.[65]  Representative Cawthorn commented on the post, "Tomorrow we go to the moon," to which Witness 1 responded with a series of moon emojis.[66]  Representative Cawthorn testified he understood the phrase "tomorrow we go to the moon" to mean an increase in value "in terms of clout . . . or in monetary value."[67]

On December 30, LGB Coin announced its sponsorship of Mr. Brown and LGB Coin reached a trading high, with market capitalization of $570 million.[68]  Witness 1 texted

---

[54] *Id.*
[55] Exhibit 3.
[56] ISC Interview of Representative Cawthorn.
[57] Exhibit 4.  *See also* Jacky Yap, WAGMI, Ape, IYKYK: 15 Crypto Slangs Only a True Crypto Nerd Will Know, Chaindebrief (Sept. 27, 2021), https://chaindebrief.com/crypto-slangs-only-a-true-crypto-nerd-will-know (defining "aped in").
[58] Exhibit 8.  The poster was one of the original defendants in the class action lawsuit, but was later dropped from the suit in the plaintiffs' Second Amended Complaint.
[59] *Id.*
[60] Exhibit 4.
[61] *Id.*
[62] Exhibit 9.
[63] *Id.*
[64] Witness 1's Response to ISC.
[65] Exhibit 10.
[66] *Id.*
[67] ISC Interview of Representative Cawthorn.
[68] *See* Danny Nelson, *Inside Madison Cawthorn's $150K Crypto Bet: Here's the Wallet Under Ethics Investigation,* COINDESK (June 1, 2022), https://www.coindesk.com/policy/2022/06/01/cawthorns-crypto-wallet-reveals-undisclosed-trades-amid-house-ethics-investigation.

Representative Cawthorn that day to tell him LGB Coin "dropped [the] announcement" that LGB Coin would be sponsoring NASCAR driver Brandon Brown.[69]

On December 31, Representative Cawthorn sold 65,841,651,026 LGB Coin, or 36.58% of his originally held coin, for an approximately 93% return on investment.[70]  Witness 1, through his counsel, told the ISC that Representative Cawthorn informed him that "he had sold roughly his principal amount after an increase in value of the Coin, which occurred after Brandon Brown's announcement that NASCAR approved the Coin's on-track sponsorship."[71]  When asked why he sold a third of his coin only ten days after he received it, Representative Cawthorn told the ISC:

> I just guess getting affiliated with the market and how things work and just trying to figure out how the apps work and that kind of thing.  I was on Christmas break, so I had downtime. . . . You know, it's not a life-changing amount of money for me for $150,000, but it's not something I just want to throw away to the wind.  And so, I mean, yeah, if I saw that something was fluctuating, I mean, again, I would have had downtime on Christmas break. I may have just been messing around on my phone trying to figure out how the apps work and selling it, and I would really try and think of this more as a game more so than I -- some form of financial asset. . . . I think I was probably just trying to have -- move around with different cryptocurrencies just to understand how they work.[72]

When asked how he determined how much of his interest to sell on December 31, Representative Cawthorn responded, "I don't know.  That's like asking the question of how did you decide to turn left or right in Pac-Man.  Again, it's more of a game."[73]

News articles indicated as early as the evening of December 31 that NASCAR's approval may not be final and that the announcement by Brandon Brown's racing team was premature.[74] On January 4, 2022, NASCAR announced that it was revoking its approval of LGB Coin as a sponsor of Mr. Brown.[75]  That same day, Representative Cawthorn sold off an additional 34,855,630,036 LGB Coin, or 19.36% of his originally held coin, for an approximately 14.6% return on investment.[76]  The trading value of LGB Coin dropped precipitously in the following weeks.  On January 17, Representative Cawthorn sold 62,277,798,642 LGB Coin, or 34.60% of

---

[69] Exhibit 4.

[70] Exhibit 7.

[71] Witness 1's Response to ISC.

[72] ISC Interview of Representative Cawthorn.

[73] Id.

[74] Daniel Villarreal, *'Let's Go Brandon' Coin Rallies as NASCAR Grapples With Insult to President Joe Biden*, NEWSWEEK (Dec. 31, 21), https://www.newsweek.com/lets-go-brandon-coin-rallies-nascar-grapples-insult-president-joe-biden-1664789; *see also*, Warner Todd Huston, *Report: NASCAR Halts Brandon Brown's Deal with 'Let's Go Brandon' Cryptocurrency, Needs Review at 'Higher Level,'* BREITBART (Jan. 3, 2022), https://www.breitbart.com/sports/2022/01/03/report-nascar-halts-brandon-browns-deal-lets-go-brandon-cryptocurrency-needs-review-higher-level.

[75] *See, e.g.*, Nick DeGroot, *Cryptocurrency Meme Coin LGBcoin to Sponsor Brandon Brown in 2022*, MOTOR SPORT (Dec. 30, 2021), https://us.motorsport.com/nascar-xs/news/cryptocurrency-lets-go-brandon-brown/7035096/ ("January 4th, 2022 update: NASCAR has officially confirmed that the sponsorship will not be approved.").

[76] Exhibit 7.

his originally held coin, for an approximately 46% loss on investment.[77]  By this time, LGB Coin was worth substantially less than its peak trading value.  Recognizing its negligible trading value, LGB Coin decided to rebrand and relaunch Let's Go Brandon Coin as LETSGO in February 2022.[78]

Following the January 17 transaction, Representative Cawthorn had sold 90.54% of his originally held coin.[79]  On February 24, 2022, Representative Cawthorn received 15,378,707,329 of the rebranded LGB Coin, equivalent to his remaining coin.[80]  Representative Cawthorn still holds this much LGB Coin, worth approximately $31 at the time of this Report.  Representative Cawthorn said he "probably would have sold" his LGB Coin to obtain "Bitcoin, those kinds of things, [that] are investments I do actually want to hold onto based on the actual investment."[81]

The below chart summarizes Representative Cawthorn's LGB Coin transactions, including the amount of Ether he received for each sale, and the approximate value of that Ether in U.S. dollars at the time of the sale.  Ether is another cryptocurrency that, unlike LGB Coin, can be cashed out or traded to purchase other cryptocurrencies on cryptocurrency exchanges such as Coinbase.

---

[77] *Id.*

[78] Matt Stieb, *Madison Cawthorn's Crypto Guru Goes Bust in the Hyperworld of Miami's Crypto Right, the 'Let's Go Brandon' Coin Sounded as Good as Gold*, NEW YORK MAGAZINE (May 12, 2022), https://nymag.com/intelligencer/2022/05/lets-go-brandon-coins-james-koutoulas-on-madison-cawthorn.html.

[79] Exhibit 11.  Representative Cawthorn's LGB Coin would not necessarily have been sold for an equivalent cash out, but rather was traded for Ether, the native cryptocurrency of Ethereum.

[80] Exhibit 7.

[81] ISC Interview of Representative Cawthorn.

| Date | Amount of LGBcoin | Ether | USD Value[82] | % Return / Loss on Investment |
|---|---|---|---|---|
| Dec. 21, 2021 | 180,000,000,000 | - | -$150,000.00[83] | |
| Dec. 31, 2021 | -65,841,651,036 | 28 | $105,000 | 93% |
| January 4, 2022 | -34,855,630,063 | 8.65 | $33,420 | 14.6% |
| January 17, 2022 | -62,277,798,642 | 8.70 | $27,998 | -46% |
| | Total Sold to Date: -162,975,079,742 | Total Ether Received: 45.35 | Unrealized Potential Cash-Out Value: $166,418[84] | Unrealized Potential Return on Investment: 10.9%[85] |

By selling LGB Coin when he did, Representative Cawthorn had the potential to recoup the value of his purchase, with a 10.9% return on his investment. However, he did not immediately transfer the Ether proceeds of his sales to his Coinbase account and cash out the Ether for U.S. dollars. The value of Ether was dropping quickly following his January sales and by the time he did cash out the proceeds, in late January, he only received $142,557.19 in fiat currency (resulting in a net loss of $7,442.81 from his initial investment). He also left a small amount of Ether in his wallet that he did not cash out.[86] Despite his overall loss, Representative Cawthorn's LGB Coin sales ensured that his loss was far less significant than it would have been had he waited even a week longer to sell off any of his coins. Additionally, Representative Cawthorn's relative loss may be mitigated by the fluctuating value of the remaining Ether.

Even after selling a majority of his coin, Representative Cawthorn continued to promote LGB Coin through March 2022. On February 27, Witness 1 posted a video on Instagram with the caption "Appreciate the @letsgo love from my boys @davidjharrisjr @madisoncawthorn stoking the CPAC FOMO."[87] In this video, Representative Cawthorn said LGB Coin was working out "very well" for him. When asked by the ISC why he said that (despite having taken an overall loss), Representative Cawthorn said he was ambushed waiting in a line, and he did not consider his words in the video.[88] He further explained he was caught off guard and that he is "just an eternal optimist at all times."[89]

---

[82] The USD Value represents the equivalent dollar value of Ether on the date Representative Cawthorn sold his LGB Coin. To trade LGB Coin, Representative Cawthorn had to sell it for Ether, as indicated on the table, and then transfer the Ether to Coinbase. From Coinbase, he could cash-out, keep the Ether, or use the Ether to purchase other cryptocurrencies. Publicly available data indicates Representative Cawthorn transferred a total of 44.3 Ether to Coinbase, worth approximately $143,919 (based on the USD equivalent of the Ether as of each transaction).

[83] As discussed further below, although Representative Cawthorn paid $150,000 for 180 billion LGBcoin, the actual value of this amount of coin was slightly higher.

[84] Based on USD equivalent value of Ether as of the date of each sale transaction.

[85] This potential return assumes cash-out of the USD equivalent of Ether as of the date of each sale transaction.

[86] Exhibit 11.

[87] Exhibit 12.

[88] ISC Interview of Representative Cawthorn.

[89] *Id.*

On March 20, Witness 1 posted a photograph from a boxing event on Instagram where he, Representative Cawthorn, and others posed while pointing at an LGB Coin logo on the floor.  The caption on the post stated, "Capping off an outrageous day with @letsgo repping in the ring at freedom fight night.  (The blood on the logo is from the guys that sold the dip)."[90]  A video from the same event was posted by LGB Coin's Twitter account @LetsGo on March 21, with the caption, in part, "@[Witness 1] and @CawthornforNC going strong at this weekend American Freedom Tour event in Fort Lauderdale!"  The video showed Representative Cawthorn tapping on the LGB Coin pin Witness 1 was wearing and saying, "Going to the moon baby!  To the moon."  Witness 1 responded, "We're only up 30 [inaudible] in 3 days."   Representative Cawthorn responded, "Oh yeah, that's not [inaudible]."  Then, Representative Cawthorn turned to the camera and said, "Let'sGoBrandon.com, get on the train.  Get on the train!"

On April 1, 2022, the class action lawsuit relating to LGB Coin was filed.  Representative Cawthorn indicated during his September 20, 2022, interview that he was unaware of the lawsuit.[91]  Representative Cawthorn told the ISC that he had no reason to believe LGB Coin is involved in a pump and dump scheme.[92]

Later in April, Representative Cawthorn was the subject of press coverage regarding allegations that he "may have violated federal insider trading laws as he hyped up an alleged pump-and-dump cryptocurrency scheme."[93]  In response to these allegations, Current Staffer 1 reached out to Witness 1 to "get his suggestions on [] what to say" because he is "an expert in this field."[94]  Witness 1 provided a draft statement to Current Staffer 1 on April 28, 2022, regarding calls for Representative Cawthorn "to be investigated for insider trading because of a comment [Representative Cawthorn] made ahead of the announcement of NASCAR's sponsorship approval of Brandon Brown's car by LGBcoin."  In the statement that Witness 1 drafted for Representative Cawthorn, he had the congressman assert, "However, I bought LGBcoin, fairly, at market price, weeks before the sponsorship was approved, and was merely commenting on the anticipation of the announcement that had already been publicly foreshadowed on both Brandon Brown's and LGBcoin's Instagram, who have tens of thousands of followers."[95]  Also in the draft statement, Witness 1 included a comment from himself, as "a securities lawyer," asserting that "Congressman Cawthorn conducted himself completely ethically when purchasing LGBcoin, at full market price, weeks before NASCAR had approved LGBcoin to be the sponsor for Brandon's car.  Any idea that he committed insider trading by posting a comment on Instagram is insane and libelous."[96]

---

[90] Exhibit 13.  Representative Cawthorn stated he was pointing at blood on the LGB Coin logo, rather than the logo itself.  ISC Interview of Representative Cawthorn.
[91] ISC Interview of Representative Cawthorn.
[92] *Id.*
[93] Andrew Kerr, *Madison Cawthorn Implicated in Potential Insider Trading Scheme, Experts Say,* WASHINGTON EXAMINER (Apr. 26, 2022), https://www.washingtonexaminer.com/news/house/madison-cawthorn-implicated-in-potential-insider-trading-scheme-experts-say.
[94] ISC Interview of Current Staffer 1.
[95] Exhibit 14.
[96] *Id.*  Witness 1 and Current Staffer 1 informed the ISC that only Witness 1 had drafted this document.  ISC Interview of Current Staffer; Witness 1's Response to ISC ("[T]o [Witness 1]'s knowledge, no other individuals were involved in the preparation of the document.").  Although Witness 1 "attempted to outline the facts of Congressman Cawthorn's actions" and "[i]n particular, to detail that the insider trading allegations were frivolous and libelous," he also stated, "[Witness 1] objects to this question to the extent it calls for pure conjecture and

While Representative Cawthorn and Current Staffer 1 both saw this draft public statement, neither felt it struck the right tone.[97] Ultimately, Representative Cawthorn responded to this allegation, as well as others, in a video posted to his Twitter account on May 4, 2022.  In the video, he stated, "a quick search would have revealed the information that I had insider knowledge of was publicly available on Instagram."[98]

### b)  Disclosure of LGB Coin Transactions

Representative Cawthorn did not timely disclose his December 21, 2021 purchase or December 31, 2021, January 4, 2022, and January 17, 2022 sales of LGB Coin.  The ISC's record indicates that this reporting failure was not due to intentional or willful conduct on the part of Representative Cawthorn, but rather the result of incorrect guidance received from Accountant 1, who he hired to assist him with his financial disclosure requirements.[99]  After his initial purchase of LGB Coin, Representative Cawthorn asked Current Staffer 1, "Can you ask [Accountant 1] how we're supposed to report the cryptocurrency things?" and Current Staffer 1 informed him that "[Accountant 1] said that it only has to be reported once a year at the end of the year."[100]  Current Staffer 1 recalled his conversation with Accountant 1, in which Accountant 1 informed him, "[N]o, we don't have to disclose cryptocurrency . . ." and as a result, "[Representative Cawthorn] was late filing his crypto because of that conversation."[101]

After news reports highlighted Representative Cawthorn's cryptocurrency trades and lack of corresponding disclosures, Current Staffer 1 texted Accountant 1 a copy of an April 27, 2022 article and asked him whether Representative Cawthorn violated the STOCK Act and to "advise of what the truth about trading crypto is."[102]  Accountant 1 replied that he would be "confirming with House Ethics" and "get back to [Current Staffer 1] asap."[103]   On April 28, 2022, Representative Cawthorn's congressional office contacted the Committee to advise that Representative Cawthorn had not filed periodic transaction reports (PTRs) for his cryptocurrency transactions based on advice received from his House-employed accountant.  In response, the Committee advised that Representative Cawthorn should file any required PTRs as soon as possible.  In an April 28 email to Current Staffer 1, Accountant 1 said, "[E]thics said if the purchase or sale exceeds $1,000, then it is reportable.  I suggest we submit a PTR."[104]  Later that day, Current Staffer 1 emailed Accountant 1 a list of over 40 of Representative Cawthorn's cryptocurrency purchases and sales between December 2021 and March 2022.  PTRs were filed

---

speculation.  [Witness 1] cannot determine the basis for Congressman Cawthorn's statements"—even though all statements in this document were his own, and in fact he attributed a statement to himself that he now contends is "pure conjecture and speculation."

[97] ISC Interview of Current Staffer 1.
[98] Madison Cawthorn (@CawthornforNC), TWITTER (May 4, 2022, 04:12 PM), https://twitter.com/CawthornforNC/status/1521945888050003975.
[99] Accountant 1 was compensated from the office's Members' Representational Allowance through his LLC.
[100] ISC Interview of Representative Cawthorn.
[101] ISC Interview of Current Staffer 1.
[102] Exhibit 15.  *See also*, Kimbery Leonard and Dave Levinthal, *GOP Rep. Madison Cawthorn Appears to Have Violated the STOCK Act by Failing to Disclose 'Let's Go Brandon' Cryptocurrency Purchase*, BUSINESS INSIDER (Apr. 27, 2022), https://www.businessinsider.com/rep-madison-cawthorn-appears-to-have-violated-the-stock-act-2022-4.
[103] Exhibit 15.
[104] Exhibit 11.

on May 27 and June 8, 2022, disclosing Representative Cawthorn's LGB Coin transactions.[105] However, he did not file any late fees with the PTRs, nor did he submit a waiver request.

Representative Cawthorn did disclose his cryptocurrency interests in his annual Financial Disclosure statement filed on August 7, 2022, which noted that he had an interest worth between $50,001 and $100,000 in Let's Go Brandon as of the end of 2021.

### 2.  Relevant Laws, Rules, and Other Applicable Standards of Conduct

General ethics principles restrict how Members may interact with commercial enterprises. Section 5 of the Code of Ethics for Government Service requires that any person in government service "[n]ever discriminate unfairly by the dispensing of special favors or privileges to anyone, whether for remuneration or not; and never accept, for himself or his family, favors or benefits under circumstances which might be construed by reasonable persons as influencing the performance of his government duties."[106]  Clause 3 of the Code of Official Conduct states that a Member "may not permit compensation to accrue to the beneficial interest of such individual from any source, the receipt of which would occur by virtue of the influence improperly exerted from the position of such individual in Congress."[107]  In providing guidance regarding actions Members may take for the benefit of private enterprises, the Committee has cautioned that Members must avoid becoming too closely affiliated with such entities, in order to avoid any appearance that they are acting in violation of these standards.[108]  The *Ethics Manual* cautions that "in participating in a privately-sponsored event a Member must take care to avoid any action that may be perceived as an endorsement of the private sponsor."[109]

In August 2018, the Committee released a Pink Sheet to "clarify and expand upon the Committee's previous guidance on Members' personal participation in the endorsement or promotion of organizations, products, or services where they have a financial interest."[110]  The Committee explained that:

> Members of the House of Representatives are widely recognizable public servants.  Even when they make no explicit mention of their official position, when Members actively engage in commercial sales or endorsements, they may create the perception that they are making use of

---

[105] Representative Cawthorn's Periodic Transaction Report (filed May 27, 2022); Representative Cawthorn's Periodic Transaction Report (filed June 8, 2022).  Another PTR was also filed on June 8, 2020 that included cryptocurrency transactions.  Representative Cawthorn's Periodic Transaction Report (filed June 8, 2022).
[106] 21 C.F.R. § 19.6(5).
[107] House Rule XXIII, cl. 3.
[108] Comm. on Ethics, *In the Matter of Allegations Relating to Representative Jared Polis*, H. Rept. 114-381, 114th Cong. 1st Sess. 3 (2015) (hereinafter *Polis*).
[109] *House Ethics Manual* (2008) at 350 (hereinafter *Ethics Manual*).
[110] Comm. on Ethics, *Guidance on Personal Endorsement or Promotion by Members of the House of Representatives* (Aug. 24, 2018), https://ethics.house.gov/financial-disclosure/financial-disclosure-pink-sheets/guidance-personal-endorsement-or-promotion (hereinafter *Personal Promotion Pink Sheet*).  This guidance on personal promotion or endorsements was a result of an investigative matter showing that more clarity on this topic was needed.  *See* Comm. on Ethics, *In the Matter of Allegations Relating to Representative Markwayne Mullin*, H. Rept. 115-898, 115th Cong. 2d Sess. (2018) (Representative Mullin appeared in commercials for his family business, but was not sanctioned, as he relied on prior Committee guidance).

their official position for commercial gain.  Members must at all times avoid even the appearance that they are monetizing their public role for personal gain.  Thus, as a general matter, Members should not be actively involved in personally selling or endorsing goods or services in which the Member or the Member's family has a financial interest.[111]

The Committee's guidance on Members' endorsement or promotion of organizations, products or services is rooted in federal conflict of interest rules, including section 5 of the Code of Ethics of Government Service, and clause 3 of the Code of Official Conduct.[112]

Federal securities law also imposes certain requirements relating to the promotion of securities by an individual, if the individual has been compensated for such promotion. Specifically, the Securities Act of 1933 Section 17(b) makes it unlawful for any person to "publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received [] from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof."[113]

The Ethics in Government Act (EIGA) and The Stop Trading on Congressional Knowledge (STOCK) Act require Members to disclose certain securities transactions over $1,000 on a PTR within 30 days of notice of the transaction, but in any case, no later than 45 days after the transaction.[114]  The Committee also released guidance on disclosure of cryptocurrency on periodic transaction reports in June 2018.  In this guidance, the Committee confirmed that cryptocurrencies must be disclosed on annual financial disclosure statements and periodic transaction reports.[115]  In the absence of knowing and willful errors or omissions, the Committee has not taken further action in late or missing PTR or financial disclosure matters once applicable late fees and amended filings have been made.[116]

The STOCK Act also affirms that Members are subject to insider trading prohibitions arising under the securities laws.[117]  Insider trading is a form of securities fraud that involves trading on the basis of material, nonpublic information.[118]  The Committee released guidance in April 2012 that states that if a Member or employee trades on material nonpublic information, they

---

[111] Personal Promotion Pink Sheet.
[112] 21 C.F.R. § 19.6(5); House Rule XXIII, cl. 3.
[113] 15 U.S.C. § 77q(b).
[114] 5 U.S.C. app. 4 § 102(a)(5).  There is a $200 fine for the first late PTR filing, no matter how many late transactions and for 2nd to 4th late-filed PTR a $200 fine for each month in which a filer had a late transaction. Comm. on Ethics, *Instruction Guide Financial Disclosure Statements and Periodic Transaction Reports Calendar Year 2021,* 7-8 (2021),
https://ethics.house.gov/sites/ethics.house.gov/files/documents/FINAL%202021%20FD%20Instructions_0.pdf.
[115] This is required regardless of how the SEC applies its insider trading prohibitions with respect to cryptocurrency.
[116] *See, e.g.,* Statement of the Committee on Ethics Regarding Representative John Rutherford (Aug. 24, 2022).
[117] Stop Trading on Congressional Knowledge Act, S 2038, as enrolled, PL 112-105 (Enacted Apr. 4, 2012).
[118] *See* 17 CFR § 240.10b5-1.

may have engaged in insider trading.[119]   The Committee's 2018 guidance reiterated the Committee's 2012 guidance that, "[w]hether or not the traditional statutes and regulation governing insider trading apply, Members and employees who engage in trading with the benefit of material nonpublic information gained in congressional service may be investigated for, and may be found in violation of, clause 1."[120]

House Rule XXV, clause 5, prohibits Members from knowingly accepting a gift, except pursuant to certain exceptions.[121]   In November 2011, the Committee issued guidance regarding personal financial transactions, which confirmed that Members may accept opportunities, like discounted investments, that are "available to the public or to a class consisting of all Federal employees" or "to members of a group or class in which membership is unrelated to congressional employment."[122]   However, the Committee stated that Members may not accept a discounted investment opportunity where the offer is for less than fair market value if it is "received solely because of their congressional status."[123]   House Rule XXV also prohibits the receipt of honoraria, defined as "a payment of money or a thing of value for an appearance, speech, or article."[124]

Under House Rule XXIII, the Code of Official Conduct, clauses 1 and 2, Members must act at all times in a manner that reflects creditably upon the House, and must "adhere to the spirit and the letter of the Rules of the House."[125]   The Code of Official Conduct also prohibits Members from receiving compensation or permitting compensation to accrue "to the beneficial interest of such individual from any source, the receipt of which would occur by virtue of influence improperly exerted from the position of such individual in Congress."[126]

3.  Analysis

a)  Promotion of LGB Coin

The ISC found that Representative Cawthorn improperly promoted a cryptocurrency in which he had a financial interest.  Representative Cawthorn received shares of LGB Coin on December 21, 2021, for which he paid $150,000.  Following this, Representative Cawthorn appeared in multiple photographs and videos in which he appears to support or specifically encourages individuals to purchase LGB Coin.  For example, in one video Representative Cawthorn states, "get on the train" and directs people to the coin's website; in another he informs

---

[119] Comm. on Ethics, *New Ethics Requirements Resulting from the STOCK Act* (Apr. 4, 2012), https://ethics.house.gov/sites/ethics.house.gov/files/Stock%20Act%20Pink%20Sheet.pdf.  This guidance defines material nonpublic information as "any information concerning a company, security, industry or economic sector, or real or personal property that is not available to the general public and which an investor would likely consider important in making an investment decision.  A good rule of thumb to determine whether information may be material nonpublic information is whether or not the release of that information to the public would have an effect on the price of the security or property."  *Id.*

[120] Comm. on Ethics, *Cryptocurrencies: Financial Disclosure Requirements and Other Ethics Ramifications* (June 18, 2018), https://ethics.house.gov/sites/ethics.house.gov/files/Cryptocurrencies%20Pink%20Sheet.pdf.

[121] House Rule XXV, cl. 5.

[122] Comm. on Ethics, *Rules Regarding Personal Financial Transactions* (Nov. 29, 2011), https://ethics.house.gov/sites/ethics.house.gov/files/fin%20trans%20pink%20sheet.pdf.

[123] *Id.*

[124] House Rule XXV, cl. 4(b).

[125] House Rule XXIII, cl. 1 & 2.

[126] House Rule XXIII, cl. 3.

18

viewers that his investment in LGB Coin was working out "very well" for him.  Likewise, he was repeatedly tagged in photographs on Instagram that promote LGB Coin.

Although Representative Cawthorn cannot control how photographs are used by others, the ISC was particularly concerned by the fact that Representative Cawthorn did not appear in just one or two photographs related to LGB Coin, but in a series of photographs and videos over the course of several months following his investment in LGB Coin.  He was also not a passive participant in the photographs; he posed while holding LGB Coin paraphernalia or pointing to logos and made direct and unambiguous comments about purchasing or supporting LGB Coin.  He also used his own Instagram account to share and comment on several posts touting LGB coin.[127]  While Representative Cawthorn told the ISC that he did not believe that the Instagram posts that he shared or was featured in amounted to promotion or endorsement of LGB Coin, and that he considered the posts to be "more of a jab at [his] political rival,"[128] the specific content and timing of those posts show a more direct effort to, in his own words, "pump this up so much."[129]  Representative Cawthorn acknowledged to the ISC that, if his followers purchased LGB Coin, it was "definitely a possibility" that the value of the coin would increase, to his own financial benefit.  The ISC did not reach a consensus on whether Representative Cawthorn intended to personally profit from his promotion of LGB Coin.  Nonetheless, Representative Cawthorn should have been sensitive to the appearance of impropriety that his actions might create.

Because Representative Cawthorn personally endorsed and promoted LGB Coin during a time when he had a financial interest in LGB Coin, he acted contrary to Committee guidance and clause 3 of the Code of Official Conduct, as well as paragraph 5 of the Code of Ethics for Government Service.

The ISC also considered whether Representative Cawthorn violated Section 17(b) of the Securities Act of 1933, or laws and rules restricting honoraria or other compensation, but did not find evidence that Representative Cawthorn was compensated by LGB Coin in exchange for his promotion of LGB Coin.  There is some indication that other "celebrity promoters" may have received compensation for their promotional activity.  For example, the class action lawsuit cites to a November 11, 2021 Twitter post by LGB Coin that stated, "[W]e have several major national media partnerships in the works as well as 10 influencers engaged."[130]  The lawsuit alleges that Witness 1 and others affiliated with LGB Coin, "actively recruited and retained conservative influencers to serve as the promotors following the launch of LGBCoin in November 2021."[131]  The complaint asserted, "[u]pon information and belief, these influencers received LGBCoins and/or other forms of consideration as part or all of their compensation for promoting" LGB

---

[127] *Cf.* Comm. on Ethics, *In the Matter of Allegations Relating to Representative Matt Gaetz*, H. Rept. 116-479, 116th Cong. 2d Sess. 4 (2020) (cautioning Members to "exercise sound judgment when using social media.").
[128] ISC Interview of Representative Cawthorn.  The Committee's guidance that Members should not be actively involved in selling or endorsing goods or services that they have a financial investment "didn't cross [his] mind." *Id.*
[129] *Compare Polis* at 9 ("[N]either Representative Polis nor his staff had reason to believe that Representative Polis' participation in the video and clothing event would serve as any advertisement for the respective companies, or that Representative Polis' image would be used to promote sales of any particular product.").
[130] Second Amended Complaint at 27.
[131] *Id.* at 39.

Coin.[132]  Witness 1, in particular, is singled out in the lawsuit for giving conservative influencers insider information and gifts of LGB Coin in exchange for their promotion of LGB Coin.[133] Representative Cawthorn and Witness 1 denied that Representative Cawthorn was compensated for promoting LGB Coin.[134]   Representative Cawthorn also denied that he entered into an agreement to promote or endorse LGB Coin, or that he received anything of value in exchange for promoting LGB Coin.[135]

### b)  Receipt of Improper Gift

The ISC also found that Representative Cawthorn received an improper gift in violation of House Rule XXV, clause 5, when he received 180 billion LGB Coin.  Although the text messages between Representative Cawthorn and Witness 1 indicate that he intended to pay full price for this cryptocurrency, as he wrote "[a]ctually I can't take the discounted Market Cap.,"[136] he nevertheless received a discounted price because he received the number of coin equivalent to $150,000 as of December 3, 2021 – despite not having actually executed any transaction on that date.  He did not provide financial consideration for the coins until December 20, 2021 at the earliest (and, given the check date of December 24, 2021, that consideration was not actually available until much later than when he may have delivered the check to Witness 1).  On the date the 180 billion in LGB Coin was actually transferred to his cryptocurrency wallet, December 21, 2021, the value of the coins he received was already worth more than $150,000.  Based on publicly available historical trading data, Representative Cawthorn would have had to pay an average of $14,237.49 more on December 21, 2021, for the coin he purchased.  Additionally, he did not face the same barriers to purchasing LGB Coin as other purchasers.  Individuals purchasing around the same time were required to pay transaction fees, also referred to as "gas fees," in order to purchase LGB Coin.[137]  Representative Cawthorn did not pay a gas fee when he received the initial 180 billion LGB Coin to his wallet.  He also had trouble completing his purchase of LGB Coin, which is why he gave Witness 1 a check.[138]  This option was not available to all other LGB Coin buyers.[139]

### c)  Allegations of Insider Trading or Securities Fraud

The timing of Representative Cawthorn's purchase and subsequent sales of LGB Coin has raised questions as to whether he had inside knowledge of LGB Coin's potential NASCAR sponsorship, particularly considering his ongoing communications with Witness 1 and his decision

---

[132] *Id.* at 39.
[133] *Id.* at 3.  One example cited by plaintiffs includes that Witness 1 publicly gifted a conservative activist $100,000 worth of LGB Coin to promote the cryptocurrency.  *Id* at 43.
[134] ISC Interview of Representative Cawthorn; Witness 1's Response to ISC.
[135] ISC Interview of Representative Cawthorn.
[136] Exhibit 3.
[137] *What Are Ethereum Gas Fees – Pinnacle Explained for Newbie,* BePAY (Mar. 5, 2022), https://bepay.finance/what-are-ethereum-gas-fees ("The users who make the transactions on the Ethereum network must pay gas fees Ethereum to miners.").
[138] ISC Interview of Representative Cawthorn.
[139] Individuals affiliated with LGB Coin stated in public promotions that buyers generally had to make the purchase through the exchange and incur transaction fees.  *See, e.g.*, Let's Go Coin Meme Page ($LETSGO) (@letsgo_memes), TWITTER (Jan. 24, 2022, 03:07 PM), https://twitter.com/letsgo_memes/status/1485705850282905601; Jeffrey Carter, *Companion Post on LGB Coins*, POINTS AND FIGURES (Nov. 1, 2021), https://jeffreycarter.substack.com/p/companion-post-on-lgb-coins.

to escalate his spending from $100,000 to $150,000. Although text messages suggest Representative Cawthorn intended to purchase LGB Coin a few weeks before he ultimately did, the purchase was ultimately executed just before the Brandon Brown NASCAR sponsorship announcement. Additionally, Representative Cawthorn's first two sales of LGB Coin coincided with the day just after the sponsorship announcement was made public and the day NASCAR subsequently revoked approval of the sponsorship. The ISC questioned Representative Cawthorn's explanations as to why he increased his investment in LGB Coin just two weeks before the announcement despite stating he understood that, as a meme coin, it had no intrinsic value.[140] The ISC also questioned why he sold a significant portion of his holdings the day after the NASCAR sponsorship announcement.[141] These questions regarding Representative Cawthorn's intent to profit from his promotion of LGB Coin were considered by the ISC and in part led to the lack of consensus regarding his intent. The ISC did not find Witness 1 to be credible or forthcoming, in particular regarding his discussions with Representative Cawthorn.[142]

Despite these concerns, the ISC did not find sufficient evidence of insider trading or fraud. There is not clear evidence on the record showing Witness 1 gave Representative Cawthorn nonpublic, material information or that Representative Cawthorn purposefully sold his LGB coin in order to gain a maximum return on his investment. Representative Cawthorn and Witness 1 have consistently denied that any inside information was exchanged. Rather, Representative Cawthorn stated in a May 4, 2022 video posted to Twitter that the information he allegedly had insider knowledge of was already publicly available on Instagram.[143] In response to the ISC's request for information, Representative Cawthorn stated that he had "no knowledge of this sponsorship before it was public" and that "[i]t was clear that a reasonable person could infer, based on the NASCAR styled number 68 in the background of the publicly posted graphic, that [LGB Coin] may have secured a sponsorship" of Brandon Brown.[144] In any event, Representative Cawthorn did not end up reaping a profit from his investment in LGB Coin.

### d) House Financial Disclosure Statements

The ISC found Representative Cawthorn did not knowingly or willfully fail to disclose cryptocurrency transactions on his PTRs. Representative Cawthorn was misinformed regarding

---

[140] ISC Interview of Representative Cawthorn.

[141] *Id.*

[142] In addition to the contradictory information regarding discussions about Representative Cawthorn's purchase of LGB Coin (*supra* fn. 41), Witness 1 stated in his written response to the ISC:

> [Witness 1] and Congressman Cawthorn discussed NASCAR's approval of the Coin's on-track sponsorship and the on-track sponsorship's subsequent revocation. Following public backlash from the virality of the 'Let's Go Brandon' phrase, [Witness 1] and Congressman Cawthorn also discussed the Coin entering into an off-track sponsorship to assist Brandon Brown to obtain the requisite financing in order to continue racing."

Witness 1's Response to ISC. However, Witness 1 did not include dates for these discussions, which goes to the heart of whether inside information was exchanged.

[143] Madison Cawthorn (@CawthornforNC), TWITTER (May 4, 2022, 04:12 PM), https://twitter.com/CawthornforNC/status/1521945888050003975.

[144] Letter from Representative Madison Cawthorn to Chairwoman Veronica Escobar and Ranking Member Michael Guest, Investigative Subcommittee (June 23, 2022).

the requirements related to cryptocurrency disclosures, which are relatively new.  The record shows that he reasonably relied on the advice of Accountant 1, an individual with substantial experience preparing PTRs and annual Financial Disclosure statements for Members of the House. Nonetheless, Representative Cawthorn is required to pay the applicable late fees for such disclosures.

## IV.    RECOMMENDATION

The ISC did not find any evidence that Representative Cawthorn had an improper relationship with a member of his staff.  Accordingly, the ISC recommends the Committee take no further action with respect to that allegation.

The ISC also did not find any evidence that Representative Cawthorn's failure to properly disclose his cryptocurrency transactions was knowing and willful and Representative Cawthorn has now made the appropriate disclosures.  However, he is required to pay $800 in late fees – $200 for his first late PTR, and $600 for the three months of late disclosures in his second late PTR. The ISC recommends the Committee direct Representative Cawthorn to make such payment within 14 days of the release of its report.

The ISC found that Representative Cawthorn improperly promoted LGB Coin, in violation of applicable conflict of interest rules.  The ISC did not reach a consensus as to whether Representative Cawthorn intended to personally profit from his promotional activity.

Representative Cawthorn also accepted an impermissible gift, with an average value of around $14,237.49, when he received LGB Coin using an earlier valuation rather than the fair market value at the time of the transaction.  Members have a responsibility to ensure they comply with House rules, including the Code of Official Conduct and the Gift Rule, and have multiple avenues to access and receive guidance regarding the rules.  The Committee has a long history of directing Members to make repayments necessary to get into compliance with applicable rules. Where the sender of a gift is unknown, the Committee has permitted repayments to be made to an appropriate charity.[145]  In this instance, it is not clear who owned the LGB Coin that was transferred to Representative Cawthorn on December 21, 2021.  While he paid Witness 1 for the coin, the ISC was not able to confirm whether the cryptocurrency wallet that deposited the coin into Representative Cawthorn's account was owned by Witness 1.  The ISC recommends that the Committee direct Representative Cawthorn to repay $14,237.49, reflecting the approximate value of the gift he received,[146] to an appropriate charitable organization.[147]

---

[145] *See* Comm. on Ethics, *In the Matter of Officially-Connected Travel by House Members to Azerbaijan in 2013*, H. Rept. 114-239, 114th Cong. 1st Sess. 10-11 (2015).

[146] The value of the actual discount provided to Representative Cawthorn may have been more or less than this amount, which is based on the average difference between the value of his LGB Coin on the day he received it and the value he paid.  This amount also does not include the value he saved on transaction fees due to his payment by check.

[147] An appropriate charitable organization is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of the Code.  The ISC recommends this amount be repaid by December 31, 2022.

The ISC could not come to a consensus as to whether to recommend the Committee reprove Representative Cawthorn. However, it is the ISC's intention that this Report serve as an admonishment of Representative Cawthorn's conduct. Representative Cawthorn did not reach out to the Committee for guidance on his promotion of LGB Coin, and had he done so, the Committee would not only have been able to advise against his public involvement with a cryptocurrency he held, it would also have been able to identify for him the need to disclose that interest. The ISC also found inconsistencies in Representative Cawthorn's testimony regarding his LGB Coin activity. Finally, while cryptocurrency promotion, particularly of a "meme coin," may be a novel issue before the Committee, whether a Member may promote an asset in which that Member has a financial interest is not a novel question. The ISC recognizes that Members will continue to grapple with questions about how ethics rules apply in the context of digital assets and takes seriously the precedent it sets in this Report.

Representative Cawthorn did not win reelection to the House for the 118th Congress and, accordingly, the Committee will lose jurisdiction over him soon. The ISC hopes, however, that its findings will serve to educate all Members about the laws and rules designed to protect the integrity of the House against conflicts of interest, including as they apply to digital assets.

# APPENDIX A to Investigative Subcommittee Report

# EXHIBIT 1

COE.CAWTHORN.000193

Subject: Re: Brandonbilt Motorsports Paint Scheme Submission – Daytona
To: Mac MacLeod
< ███████ @fastlanemediainc.com>

Good morning Mac,

The sponsors are approved however please clea up the markings around the number especially the white stars touching the white number.

2022 we are really going to hone in on keeping the numbers clean per the rule book nothing within 2" should be touching the numbers we understand some step and repeats, however in this case white and white makes it blob.

My rule of thumb is step back from the compute screen and see how it looks. In the shop or up close it looks fine but think about the tower or safety vehicles seeing it go 170mph

Dale Howell
NASCAR Racing Operations

# EXHIBIT 2

CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC

Ruddy Gregory, PLLC
1225 15th Street NW,
Washington, D.C. 20005
(202)-797-0762

13:18

JAMESKOUTOULAS
**Posts**

Follow

**jameskoutoulas**
Naples, Florida

•••



139 likes

**jameskoutoulas** About last night

View all 8 comments

December 4, 2021

**jameskoutoulas**
Mar-a-Lago

•••

FOIA CONFIDENTIAL TREATMENT REQUEST

COE.CAWTHORN.000157

HOR COE LGB016

# EXHIBIT 3

CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC

8:59

Madison ›

iMessage
Fri, Dec 3, 7:15 PM

Madison cawthorn 👍

Fri, Dec 3, 9:49 PM

Legend

Sat, Dec 4, 7:35 AM

Pleasure meeting you sir! What's the best way to do a max donation? Could you also send the pic of us?

Sun, Dec 5, 12:13 AM

Hey brother!

Btw confirmed 100k at 275M market cap so you have record

Wow! Thank you brother.

My pleasure

Mon, Dec 6, 5:19 PM

Actually I can't take the discounted Market Cap. Could you please quote me the full market cap at the time of agreement?

COE.CAWTHORN.000118

FOIA CONFIDENTIAL TREATMENT REQUEST      HOR COE LGB006

CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC

Ruddy Gregory, PLLC
1225 19th Street NW,
Washington, D.C. 20005
(202) 797-0762

···

**Madison** ›

Ah too bad. Yessir it was 313M

But I'll actually buy in 150K after reviewing my finances. If that works for you!

Of course, we're honored

Tue, Dec 7, 12:45 PM



Downloading...
IMG_6464.jpeg
0 bytes / 183KB

Which one of these is it?

LGB

COE.CAWTHORN.000119

FOIA CONFIDENTIAL TREATMENT REQUEST

HOR COE LGB007

CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC



Ruddy Gregory, PLLC
1225 19th Street NW,
Washington, D.C. 20005
(202) 797-0782

**Madison** ›



**Downloading...**
IMG_6464.jpeg
0 bytes / 183KB

Which one of these is it?

LGB

Second one

Thanks

You're welcome

Wed, Dec 15, 1:25 PM

Don't give you a check for the 150k?

Do**

Do I give you**

Yea

Ruddy Gregory, PLLC
1225 19th Street NW,
Washington, D.C. 20005
(202) 797-0762

● ● ●

**Madison** ›

Tue, Dec 21, 11:59 PM

Excited to announce that I bought some LGB!

> Welcome Aboard Patriot!

So excited man! Let's pump this up so much and be friends for another couple decades!

> Amen brother

# EXHIBIT 4



COE.CAWTHORN.000200



COE.CAWTHORN.000201

# EXHIBIT 5



DAVID MADISON CAWTHORN &
TIMOTHY CAWTHORN TTEES
U/A DTD 12/01/2016
DAVID MADISON REV SETTLEMENT TR

12/24/21

Pay to the Order of: James Koutoulas          $ 150,000.00

One Hundred Fifty Thousand and %100          Dollars

Edward Jones

For   LGB coin                    Madison Cawthorn

12/31/2021 11:26:53 AM

12/31/2021 11:26:56 AM

| Account | Serial | Sequence | Paid Date | Amount |
|---|---|---|---|---|
| | | | 01/03/2022 | $150,000.00 |

COE.CAWTHORN.000192

# EXHIBIT 6



COE.CAWTHORN.000170

# EXHIBIT 7



COE.CAWTHORN.000179

180,000,000,000 LGB

# $81.79

| | |
|---|---|
| From | |
| To | |
| Network | Ethereum |
| Submitted | 1:47 PM Dec 21, 2021 |
| Completed on | 1:47 PM Dec 21, 2021 |
| Amount | $81.79 • 180,000,000,000 LGB |
| Network fee ⓘ | $4.28 • 0.0025 ETH |
| Total received | $81.79 • 180,000,000,000 LGB |

60,460,652.927 LGB

# $0.03

| | |
|---|---|
| From | |
| To | |
| Network | Ethereum |
| Submitted | 10:15 AM Dec 31, 2021 |
| Completed on | 10:15 AM Dec 31, 2021 |
| Amount | $0.03 • 60,460,652.927 LGB |
| Network fee ⓘ | $36.50 • 0.0213 ETH |
| Total amount | $36.53 • 60,460,652.927 LGB |

COE.CAWTHORN.000181

604,606,529.273 LGB

# $0.27

| | |
|---|---|
| From | |
| To | |
| Network | Ethereum |
| Submitted | 10:17 AM Dec 31, 2021 |
| Completed on | 10:17 AM Dec 31, 2021 |
| Amount | $0.27 • 604,606,529.273 LGB |
| Network fee ⓘ | $56.71 • 0.0331 ETH |
| Total amount | $56.98 • 604,606,529.273 LGB |

COE.CAWTHORN.000182

352,077,071.347 LGB

# $0.16

| | |
|---|---|
| From | |
| To | |
| Network | Ethereum |
| Submitted | 3:30 PM Jan 04, 2022 |
| Completed on | 3:30 PM Jan 04, 2022 |
| Amount | $0.16 • 352,077,071.347 LGB |
| Network fee ⓘ | $42.64 • 0.0249 ETH |
| Total amount | $42.80 • 352,077,071.347 LGB |

COE.CAWTHORN.000183

629,068,673.161 LGB

# $0.29

| | |
|---|---|
| From | |
| To | |
| Network | Ethereum |
| Submitted | 8:49 PM Jan 17, 2022 |
| Completed on | 8:49 PM Jan 17, 2022 |
| Amount | $0.29 • 629,068,673.161 LGB |
| Network fee ⓘ | $33.65 • 0.0196 ETH |
| Total amount | $33.94 • 629,068,673.161 LGB |

COE.CAWTHORN.000184

15,378,707,329 LETSGO

# $90.18

| | |
|---|---|
| From | |
| To | |
| Network | Ethereum |
| Submitted | 2:07 AM Feb 24, 2022 |
| Completed on | 2:07 AM Feb 24, 2022 |
| Amount | $90.18 • 15,378,707,329 LETSGO |
| Network fee ⓘ | $2,171.67 • 1.268 ETH |
| Total received | $90.18 • 15,378,707,329 LETSGO |

COE.CAWTHORN.000185

# EXHIBIT 8



COE.CAWTHORN.000159

# EXHIBIT 9

CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC

 **Madison Cawthorn** ✔️
madisoncawthorn

  

You mentioned Madison Cawthorn in your story

 Only you can see this



Replied to your story

  Only you can see this

 Ooooooooo

Kekeke. See you at Peters tonight?!

 Yes brother! See you there.
 ❤️

Yay

 Message...   

FOIA CONFIDENTIAL TREATMENT REQUEST     HOR COE LGB010

# EXHIBIT 10

CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC
Case 1:23-mc-23241-JEM Document 1-13 Entered on FLSD Docket 08/29/2023 Page 68 of 81
Ruddy Gregory, PLLC
1225 15th Street NW,
Washington, D.C. 20005
(202)-797-0762

JAMESKOUTOULAS

## Posts

‹        **Follow**

 **jameskoutoulas**      • • •



♡   💬   ⊳                    🔖

**208 likes**

**jameskoutoulas** Never get sick of a @madisoncawthorn bro out

View all 17 comments

**madisoncawthorn** Tomorrow we go to the moon!    ♡

# EXHIBIT 11

**Subject:**   Re: 2021 FDS - CRYPTO CURRENCIES
**Date:**   Thursday, April 28, 2022 at 6:20:44 PM Eastern Daylight Time
**From:**   Harp, Blake
**To:**   ▮▮▮▮▮ anfinsonllc.com
**Attachments:** image001.jpg, Book.xlsx

Updated spreadsheet

## Blake Harp
Chief of Staff
U.S. Congressman Madison Cawthorn (NC-11)
O: (202) 225-6401
C: ▮▮▮▮▮▮
102 Cannon House Office Building
Washington, D.C. 20515
https://Cawthorn.House.Gov



---

**From:** ▮▮▮▮ anfinsonllc.com" ▮▮▮▮▮ @anfinsonllc.com>
**Date:** Thursday, April 28, 2022 at 10:09 AM
**To:** Chief of Staff NC-11 ▮▮▮▮▮ @mail.house.gov>
**Subject:** RE: 2021 FDS - CRYPTO CURRENCIES

Hi Blake – ethics said if the purchase or sale exceeds $1,000, then it is reportable.

I suggest we submit a PTR even if it is delinquent just to go on record.  We will also report in the FDS, which is due May 15.

Will need the name, date and amount of any purchases and sales in 2021, and so far in 2022.

Thanks,  Tom

**Thomas E. Anfinson**
Certified Public Accountant
▮▮▮▮▮▮

COE.CAWTHORN.000066

| Name | Date | Price | # of coins | Buy/Sell |
|------|------|------:|-----------:|----------|
| BTC | 3/30/22 | 29,665.35 | 0.63 | Buy |
| BTC | 3/23/22 | -19,977.23 | 0.47 | Sell |
| BTC | 3/23/22 | 20,000.01 | 0.47 | Buy |
| Btc | 1/27/22 | 1,000 | 0.02 | Buy |
| Btc | 1/26/22 | 17,628.89 | 0.46 | Buy |
| BTC | 44,586 | 1,500 | 0.04 | Buy |
| Btc | 1/24/22 | 35,700.00 | 1.01 | Buy |
| ETH | 3/25/22 | 8,045.70 | 2.57 | Buy |
| Eth | 3/23/22 | -24,987 | 8.42 | Sell |
| Eth | 1/29/22 | 20,699.64 | 8 | Buy |
| ETH | 1/26/22 | 18,000 | 7.25 | Sell |
| Eth | 1/25/22 | 24,684.45 | 10 | BUY |
| Eth | 1/25/22 | 13,000 | 5.38 | Buy |
| Eth | 12/31/21 | 100,064.21 | 26.35 | Buy |
| Eth | 12/27/21 | 1,152.13 | 0.27 | Buy |
| Eth | 12/27/21 | -1,152.13 | 0.29 | Sell |
| ETH | 12/27/21 | 1,200 | 0.29 | Buy |
| REQ | 3/25/22 | 7,802.52 | 28,471.17 | Buy |
| REQ | 3/24/22 | -7,995.01 | 30,215.45 | Sell |
| REQ | 3/23/22 | 6,827.01 | 26,572.01 | Buy |
| REQ | 3/23/22 | 950 | 3,643.43 | Buy |
| KRL | 3/25/22 | -8,028.51 | 7,215.66 | SELL |
| KRL | 3/24/22 | -43,000 | 36,328.30 | SELL |
| KRL | 3/24/22 | 34,998.42 | 30,436.05 | BUY |
| KRL | 3/24/22 | -40,000 | 33,416.87 | SELL |
| KRL | 3/23/22 | 18,985.67 | 16,548.12 | BUY |
| KRL | 3/23/22 | 24,229.63 | 21,161.24 | BUY |
| KRL | 3/23/22 | 9,706.66 | 8,815.42 | BUY |
| SOL | 3/25/22 | -41,361.73 | 420 | SELL |
| SOL | 3/24/22 | 41,733.32 | 409.13 | BUY |
| SOL | 3/23/22 | -7,000 | 74.79 | SELL |
| SOL | 3/23/22 | -10,000 | 107.12 | SELL |
| SOL | 2/15/22 | 8,000 | 76.49 | BUY |
| SOL | 2/12/22 | 3,000 | 29.96 | BUY |
| SOL | 2/10/22 | 10,000 | 86.32 | BUY |
| LGB | 12/21/21 | 150,000 | 180,000,000,000 | Buy |
| LGB | 12/31/21 | 111,930.80 | 65,841,651,037.00 | SELL |
| LGB | 1/4/22 | 30,324.39 | 34,855,630,063 | SELL |
| LGB | 1/17/22 | 302 | 629,068,673 | SELL |
| SAND | 2/3/22 | 479.02 | 192.37 | Buy |
| VRA | 2/3/22 | 660.16 | 39,094.01 | BUY |
| POLC | 2/3/22 | 48.85 | 349.3 | BUY |
| MANA | 2/3/22 | 511.53 | 283.54 | BUY |

COE.CAWTHORN.000067

# EXHIBIT 12



COE.CAWTHORN.000171

# EXHIBIT 13

CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC

9:01 ◎ ⌖

LTE 🔋



← Photo ↺

 **jameskoutoulas** • • •



**View insights** Boost Post

♡ 💬 ✈ 🔖

 Liked by **annagkunz** and **203 others**

**jameskoutoulas** Capping off an outrageous day with @letsgo repping in the ring at freedom fight night. (The blood on the logo is from the guys that sold the dip)

View all 14 comments

**letsgo** Let's go!! ❤

March 20

COE.CAWTHORN.000109

FOIA CONFIDENTIAL TREATMENT REQUEST

HOR COE LGB001

# EXHIBIT 14

Ruddy Gregory, PLLC
1225 15th Street NW
Washington, DC 20005
(202)-797-0762
CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC

Success has always been about showing the best qualities, when you see my name, it should be synonymous with integrity. When opponents can't talk about their qualities, they resign to trying to drag us down below them. This time it seems Sen Thom Thillis's super-PAC and lobbyists have devoted at least $300K to pushing a fake narrative, a disappointing move from the RINO side. A lobbyist paid by Tillis's RINO super-PAC is calling for me to be investigated for insider trading because of a comment I made ahead of the announcement of NASCAR's sponsorship approval of Brandon Brown's car by LGBcoin. However, I had bought LGBcoin, fairly, at market price, weeks before the sponsorship was approved, and was merely commenting on the anticipation of the announcement that had already been publicly foreshadowed on both Brandon Brown's and LGBcoin's Instagram, who have tens of thousands of followers.



This pathetically desperate RINO attack is falsely and maliciously trying to spin a public comment on public information for something that I owned weeks prior as a serious crime and means to

HOR COE LGB011
COE.CAWTHORN.000115

Ruddy Gregory, PLLC
1225 15th Street NW
Washington, DC 20005
(202)-797-0762

CONFIDENTIALITY TREATMENT REQUESTED BY RUDDY GREGORY, PLLC

waste millions of taxpayer dollars on a frivolous investigation, like the Clintons did with the fabricated Steele Dossier.

While it's obvious that Tillis has no understanding of cryptocurrency, I am a huge believer in democratizing access to currency to place limits on government control, and have been supportive of the Pro Free Speech elements of the LetsGoBrandon meme coin project. Just as Elon Musk has fought for free speech and extolled the virtues of meme coins through Dogecoin, the LetsGoBrandon project was inspired by investor protection advocate James Koutoulas who recovered $6.7 billion from one of Obama's biggest campaign bundlers, former Goldman Sachs CEO Jon Corzine, completely pro bono. I've been proud to support the project which keeps fighting back against censorship and de-platforming by both Big Tech and NASCAR who subsequently revoked their sponsorship approval, damaging thousands of patriots.

Mr. Koutoulas, a securities lawyer confirmed, "Congressman Cawthorn conducted himself completely ethically when purchasing LGBcoin, at full market price, weeks before NASCAR had approved LGBcoin to be the sponsor for Brandon's car. Any idea that he committed insider trading by posting a comment on Instagram is insane and libelous."

COE.CAWTHORN.000116

# EXHIBIT 15



< 22    TA    Thomas ›



**Rep. Madison Cawthorn appears to have violated the STOCK Act**
businessinsider.com

Thomas this is Blake. Can you read this article and let me know if it's true. If not please advise of what the truth about trading crypto is so I can issue a statement

Thu, Apr 28, 4:44 AM

Hi Blake - confirming with House Ethics. Back to you asap.

Sat, May 14, 8:07 PM

Are financial disclosure going out tomorrow?

They are due Monday but can be extended for 90 days.

Is DMC's ready for Monday?

I still had a couple of questions, but i have a draft  that ethics  has reviewed.
I will resend tomorrow.  I will also text the questions in the morning.

      iMessage